**GULF OIL CORPORATION, et al.**

v.

**UNITED STATES DEPARTMENT OF ENERGY, et al., Appellants.**

**No. 80–2096.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 4, 1981.

Decided Aug. 24, 1981.

Michael T. Scott, Atty., Dept. of Justice, Washington, D. C., with whom Dennis G. Linder, Atty., Dept. of Justice, and Nancy C. Crisman, Atty., Dept. of Energy, Washington, D. C., were on brief for appellants.

Donald B. Craven, Washington, D. C., with whom Mark L. Evans, Craig Miller and James P. Tuite, Washington, D. C., were on brief for appellee, Gulf Oil Corp.

Richard H. Porter, Washington, D. C., with whom Steven H. Brose and Samuel T. Perkins, Washington, D. C., were on brief for appellee, Atlantic Richfield Co.

Roland W. Selman and Nina H. Questal, Washington, D. C., were on brief for appellee, Chevron, U.S.A., Inc.

Before ROBINSON, Chief Judge, and WALD and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Opinion concurring in the judgment filed by Circuit Judge GINSBURG.

WALD, Circuit Judge:

This case raises a difficult question in a troubling and unusual context: whether a district court may intervene in an ongoing administrative adjudicatory proceeding to expand discovery into an alleged pattern of wrongdoing by agency officials that could affect the outcome of the proceeding. The alleged wrongdoing consisted of the destruction of documents of arguable relevance to the administrative proceeding, and

prohibited *ex parte* communications between the hearing officer and enforcement personnel. Because our decision to vacate the district court's order rests on a peculiar sequence of events, we begin by narrating these events in some detail.

## I. THE HISTORY OF THE PROCEEDINGS

### A. *The Crude Cluster Proceedings*

The proceedings before us concern alleged violations by seven major crude oil producers[1] of mandatory crude oil pricing regulations[2] issued by DOE and its predecessors[3] pursuant to the Emergency Petroleum Allocation Act of 1973 (EPAA).[4]

In 1977 Congress transferred to the newly created Department of Energy (DOE) the functions then exercised by the FEA and its Administrator.[5] Pursuant to § 206 of the Department of Energy Organization Act (the Act), 42 U.S.C. § 7136, the Secretary of Energy delegated to the Economic Regulatory Administration (ERA) the regulation and enforcement functions concern-

ing, *inter alia*, mandatory petroleum allocation and pricing.[6] Soon thereafter the Secretary established within ERA the Office of Special Counsel for Compliance (OSC) and charged it with prosecuting individual enforcement actions.[7] OSC was specifically directed "to conduct an accelerated audit, investigation, and enforcement effort with respect to [the 34 major refiners], with the primary mission to complete the audits of at least the largest 15 refiners within 2 years and take appropriate enforcement action."[8]

On May 1, 1979, in one of its most significant enforcement actions to date, OSC issued seven proposed remedial orders[9] (PROs) alleging that major producers of crude oil were guilty between September 1973 and March 1979 of charging prices 1.7 billion dollars in excess of what the Mandatory Petroleum Price Regulations permitted.[10]

Under the EPAA regulations allegedly violated, the crude oil producers must

---

**1.** The seven producers include the three appellees and Marathon Oil Co., Standard Oil of Indiana (AMOCO), Standard Oil of Ohio (Sohio) and Texaco, Inc.

**2.** 10 C.F.R. Part 212 (1981).

**3.** The precursors of the Department of Energy were the Cost of Living Council (COLC) (August 1973—December 1973), the Federal Energy Office (FEO) (December 1973—August 1974), and the Federal Energy Administration (FEA) (August 1974—October 1977). *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 857 n.1 (D.C.Cir.1980).

**4.** 15 U.S.C. § 751 *et seq.* The Economic Stabilization Act of 1970 (ESA), 12 U.S.C. § 1904, is incorporated into the EPAA by § 5(a)(1) of the EPAA, 15 U.S.C. § 754(a)(1).

**5.** Department of Energy Organization Act of 1977, § 301(a), 42 U.S.C. § 7151(a).

**6.** DOE Delegation Order No. 0204–4, 42 Fed. Reg. 60726 (November 29, 1977).

**7.** DOE Interim Management Directive No. 4104 (November 14, 1977); 10 C.F.R. § 1000.1 (1981).

**8.** DOE Delegation Order No. 1100.2 (July 25, 1978).

**9.** "[OSC] may issue a Proposed Remedial Order at any time it finds that a violation has occurred, is continuing, or is about to occur. . . ." 10 C.F.R. § 205.192(b) (1981). OSC is charged to enforce the Phase IV Petroleum Price Regulations, former 6 C.F.R. Part 150, and the Mandatory Petroleum Price and Allocation Regulations, 10 C.F.R. Parts 210–212. Upon the issuance of a proposed remedial order, any aggrieved person may file a Notice of Objection and a statement of the nature of those objections within fifteen days with the Office of Hearings and Appeals (OHA), 10 C.F.R. § 205.-193 (1981), an independent adjudicative entity within DOE. (Pursuant to § 503(a) of the Act, 42 U.S.C. § 7193(a), the Secretary delegated to OHA the authority to issue remedial orders. 44 Fed.Reg. 7922 (February 7, 1979); 10 C.F.R. § 205.190(b) (1981).) OHA will thereafter conduct a hearing with limited rights of discovery and, if it chooses, an evidentiary hearing at which the parties may present evidence on disputed issues of fact and cross-examine witnesses. *Id.* §§ 205.198, 205.199 (1981).

**10.** Decision and Order of Office of Hearings and Appeals, Docket Nos. BRZ–0015 through 0022, at 1 (January 25, 1980) [hereinafter "January 25 order"], Joint Appendix [J.A.] 312.

determine the first sale price of crude oil on the basis of the production from a property during a specified base period.... "[P]roperty" is defined as the right to produce crude oil which arises from a lease or a fee interest.... [11]

Each PRO contains allegations that the producers misclassified "properties" from which crude oil was produced.[12] In defense, the producers argue that the EPAA regulations, and in particular the definition of "property," are ambiguous on their face, and have a history of tortuous agency interpretation and application.[13] The producers assert that they should not be (indeed, they cannot be) penalized for failing to adhere to regulations whose precise meaning has neither been intelligently defined nor even agreed upon by agency personnel themselves.[14]

This alleged inherent ambiguity in the basic definition of "property" constitutes the producers' major defense to the allegations contained in the proposed remedial orders. Therefore, the several crude oil producers, sometimes acting in concert and sometimes separately, have sought extensive discovery before OHA of the agency's [15] contemporaneous construction of its regulations and of agency documents relating to the issuance of the PROs.[16]

### 1. The Two Incidents of Document Destruction [17]

The producers sought extensive discovery into two incidents of alleged document destruction that came to their attention in 1979 and 1980. The first incident concerned a file reorganization conducted between August 8 and 15, 1979, by OSC's Crude Production Audit Division (CPAD) after the producers had filed for discovery of CPAD's audit files. Neil Tonken, Deputy Solicitor to the Special Counsel in charge of the crude cluster enforcement proceedings, and Leigh Manasevit, an Assistant Solicitor, conducted an internal investigation of this incident immediately after learning of it. Although Tonken, in a letter to the parties informing them of the August document destruction incident,[18] concluded that most

11. January 25 order, *supra* note 10, at 3–4 (citations to regulations omitted), J.A. 314–15.

12. *Id.* at 4, J.A. 315.

13. This history has recently been recounted in *State of Louisiana v. DOE*, 507 F.Supp. 1365, 1367–1369 (W.D.La.1981), and *Texaco, Inc. v. DOE*, 490 F.Supp. 874, 878–881 (D.Del.1980).

14. Amended and Supplemental Complaint, ¶¶ 15–19, J.A. 128–130; January 25 order, *supra* note 10, at 4, J.A. 315. One district court has recently described the ambiguity in the term "property" and the inability of DOE to clarify the meaning of the term, commenting that "[e]ven when you play 'pin the tail on the donkey,' the rules require that you turn the blind-folded participant in the right direction." *State of Louisiana v. DOE*, 507 F.Supp. 1365, 1376 (W.D.La.1981).

15. "Agency" here refers to DOE and its three predecessors, COLC, FEO and FEA. *See* note 3 *supra*.

16. A party before OHA may file a motion for discovery requesting inspection of documents, interrogatories, admissions and depositions, 10 C.F.R. § 205.198(b) (1981), but OHA determines the extent of any discovery. The movant must demonstrate that the evidence sought is relevant, material, and necessary, and will not oc-

casion undue delay. Depositions are permissible as a last resort, only on a "convincing showing" that the material cannot be obtained through another specified method of discovery. *Id.* § 205.198(e) (1981). *Discovery orders by OHA "shall be subject to further administrative review or appeal only upon issuance of [a final remedial order]." Id.* § 205.198(i) (1981) (emphasis supplied).

17. The following events have been recounted in several different documents in the Joint Appendix. The primary sources include a memorandum from Neil Tonken and Leigh Manasevit to Paul Bloom, October 26, 1979 [hereinafter "Tonken memorandum"], J.A. 1202–09, the Report on Investigation of Questions of Possible Document Destruction by the Office of Special Counsel for Compliance, Office of Inspector General, Report No. 104 (March 17, 1980) [hereinafter "Inspector General's Report"], J.A. 1001–03, and a Decision and Order of OHA, Case Nos. BRZ–0024 through 0030 (April 28, 1980) [hereinafter "April 28 order"], J.A. 1699–1714. Citation to one or more supporting documents in the Joint Appendix is not meant to be exhaustive.

18. Separate Appendix to Appellee's Motion to Dismiss or in the Alternative for Summary Affirmance, January 21, 1981 [hereinafter "Sep. App."], Attachment A.

of the documents destroyed were duplicates, and that those which could not be replaced—buck slips, rough drafts of documents later formalized, newspaper articles and cartoons—were on the whole insignificant, the producers sought discovery into this incident.[19] OHA restricted such discovery to a single deposition of the individual with "principal knowledge" of the August document destruction incident, to be conducted by one party only.[20]

The second clearly more serious incident involved the alleged destruction in either late 1978 or early 1979 of an issues paper used by CPAD auditors in detailing and discussing interpretative problems confronting them.[21] Tonken and Manasevit learned of this incident from an interview with Ron Rosapep, the CPAD auditor who had conducted the August file reorganization and the one selected by Tonken to be deposed as having "principal knowledge" of those events. The most damaging version of the second incident of document destruction is recounted in an October 26, 1979 memorandum from Tonken and Manasevit to Special Counsel Paul Bloom. In May 1979, Rosapep heard rumors that an order had been given to destroy all copies of the issues paper, rumors that were corroborated later that month when Rosapep met with Harry Bayne, Chief Counsel of CPAD.

> Rosapep asked if he could keep his copy at his home, and Bayne replied that he could not because they would go into his home and get it. Rosapep told Manasevit that in this statement Bayne was refer-

ring to the crude oil producers' acquiring the position paper through discovery and that it was clear to Rosapep that Bayne did not want that to occur. Rosapep advised Manasevit that he stated to Bayne that the effort to destroy the document would not be successful because there were too many copies of it in existence and it would be impossible to locate them all. Bayne replied that, regardless of this problem, Carl Corrallo had ordered that the documents were to be destroyed. Rosapep did not destroy his copy, however, but instead went to John Wesner [Deputy Director of CPAD], and asked whether, in fact, he was required to destroy it. According to Rosapep, Wesner said that that had been the order but that Dean Cooper, of the Solicitor's Office, had told him it was no longer operative.[22]

In the weeks that followed the disclosure of these events, three in-house investigations were conducted within DOE. However, the producers were not informed of the issues paper incident, as they had been informed of the August incident.

Tonken and Manasevit conducted the first of these internal investigations. The Solicitor, Carl Corrallo, denied to both Manasevit and Tonken ever giving such an order to destroy the issues paper, but conceded that he may have directed the participants in a December 1978 meeting concerning the issues paper to destroy *their copies*.[23] In their October 26 memorandum to

---

19. For a chronology of the discovery requests made by the producers before OHA, *see* Plaintiffs' Submission of Discovery Requests and Other Relevant Pleadings Filed With the Office of Hearings and Appeals, J.A. 1399, at 1403–06.

20. Decision and Order of OHA, Case No. BRZ–0012 (October 24, 1979), J.A. 745. Melvin Goldstein, the Director of OHA, said he allowed only the one deposition in part because Tonken had assured Goldstein there was one person with "principal knowledge" of the incident. *See* Transcript of October 17, 1979 Hearing Before OHA, at 34, J.A. 718.

21. The issues paper consists of narrative examples and illustrations of hypotheticals concerning the crude oil pricing regulations. Although

OSC has disputed its relevance to the crude cluster proceedings, that contention cannot be credited, at least on this record. The entire focus of agency proceedings is on the meaning, interpretation and construction of these pricing regulations, and their application to the producers' conduct. It goes without saying that hypotheticals posed, discussed and resolved can often clarify complex regulations, as well as accentuate their ambiguity or reveal inconsistencies in their application.

22. Tonken memorandum, *supra* note 17, at 5–6, J.A. 1206–07.

23. *Id.* at 7, J.A. 1208; Inspector General's Report, *supra* note 17, at 6, J.A. 1008.

Paul Bloom, Tonken and Manasevit concluded that "the entire matter of document destruction discussed herein must be referred to the Department of Justice for evaluation and appropriate action." [24]

Special Counsel Paul Bloom then proceeded to conduct an independent investigation of these two incidents, interviewing Rosapep, Corrallo and Jimmy Mayberry, the Director of CPAD. [25] Bloom met with two attorneys of the Public Integrity Division of the Justice Department, who, when apprised of the facts as told by Bloom, declined to accept the matter for investigation of possible misconduct. [26] Bloom also talked about these matters to the DOE Assistant General Counsel for Standards of Conduct. [27] In a lengthy memorandum dated January 16, 1980, Bloom disclosed to the Director of OHA, Melvin Goldstein, the results of his in-house investigation. [28] He concluded there had been no order to destroy copies of the issues paper. In fact, many copies were and are still in existence. Instead, Corrallo had given only an order to "limit distribution" of the issues paper, so as to prevent the producers from successfully relying upon "erroneous and unauthorized interpretative advice from CPAD audi-

tors," as they had done in the past. [29] Bloom contended that the questions raised in the Tonken memorandum were not relevant to the crude cluster proceedings before OHA, that the whole matter has been "fully and independently" examined and found to be "totally innocuous," and that "OHA should accord no consideration whatever to the materials privately presented to you by Tonken and Manasevit." [30]

Two months after Special Counsel Bloom was informed by the Tonken memorandum of the two separate incidents of document destruction, Tonken and Manasevit notified the Inspector General of DOE of these matters and urged a separate, additional investigation and evaluation. [31] Director Melvin Goldstein in a letter to the Inspector General made a similar request. [32]

After a six-week investigation into these incidents, the Inspector General issued a report on March 17. [33] The Inspector General's investigation found that "no documents were *improperly* destroyed by the Office of Special Counsel; but ... found inadequate the Office of Special Counsel's response to internal rumors of such document destruction." [34] Concerning the August 1979 Dal-

---

**24.** *Id.* at 8, J.A. 1209.

**25.** At the end of October Bloom removed Tonken and Manasevit from any responsibility concerning the crude cluster proceedings, for "overreaching," and "immature," "unprofessional" conduct. Bloom also temporarily removed Carl Corrallo from the proceedings, but later reinstated him upon completion of Bloom's investigation.

**26.** Memorandum from Paul Bloom to Melvin Goldstein (January 16, 1980) [hereinafter "Bloom memorandum"] at 3, J.A. 1214.

**27.** None of those attorneys, however, read the Tonken memorandum, and a later investigation could not resolve whether Bloom had even given them an opportunity to view the October 26 memorandum. Inspector General's Report, *supra* note 17, at 18–19, J.A. 1020–21.

**28.** Bloom memorandum, *supra* note 25, J.A. 1212.

**29.** *Id.* at 4, J.A. 1215.

**30.** *Id.* at 6–7, J.A. 1217–18.

**31.** Memorandum from Tonken and Manasevit to the Inspector General, at 5 (December 28, 1979), Sep.App., *supra* note 18, Attachment A.

**32.** Memorandum from Goldstein to Paul Bloom and J. Kenneth Mansfield (January 4, 1980), J.A. 1210; Inspector General's Report, *supra* note 17, at 2, J.A. 1004.

**33.** The Office of Inspector General was created by Congress in § 208 of the Act, 42 U.S.C. § 7138. The Inspector General is appointed by the President, and reports directly to the Secretary. The Office is not within either OSC or OHA, and thus is technically independent of both. Section 208(a)(1) of the Act, 42 U.S.C. § 7138(a)(1). Among the Inspector General's duties are "to conduct ... activities ... for the purpose of ... preventing and detecting fraud and abuse in, its programs and operations" and "the identification and prosecution of participants in such fraud or abuse." §§ 208(b)(2), (b)(3)(B) of the Act, 42 U.S.C. §§ 7138(b)(2), (b)(3)(B).

**34.** Inspector General's Report, *supra* note 17, at 2 (emphasis supplied), J.A. 1004. The investigation included thirty-two individual inter-

las file reorganization, the Report found that only "Division files" were reorganized by CPAD auditors. No audit or case files—the files used by OSC in its enforcement actions—were destroyed.[35]

Regarding the issues paper incident, the Report stated that at the end of a policy meeting in February 1979,

[There] was a suggestion by the Solicitor to limit distribution of copies of the papers within the staff of the Office of Special Counsel to prevent misuse of the papers [by OSC personnel].

We also found that although this guidance was intended solely to limit distribution of copies of the discussion papers and involved no intent to destroy copies improperly, some copies of the papers were destroyed. This happened in February, 1979, and in our view, resulted from misconstruction by the Chief Counsel of [CPAD] [Harry Bayne] of the guidance on limiting distribution of copies that had been previously suggested by the Solicitor to OSC. The Chief Counsel informed us that he ordered his staff to destroy their copies of the papers in an attempt to accomplish the purpose of the Solicitor's guidance. . . .[36]

The Report noted that "some copies of the discussion papers cannot be accounted for,"[37] and "the original does not exist in its entirety." Its absence, the Report stated, "could not be accounted for."[38] Finally, the Report concluded that "no order to destroy the papers was given by the Solicitor [Carl Corrallo] at any time."[39]

The Inspector General also found OSC's internal investigations "were not extensive and thorough enough to lay to rest conclu-

sively the rumors about possible document destruction."[40] The Report criticized both Tonken and Manasevit and Bloom for failing to promptly notify the Inspector General.[41]

We found that the rumors about possibly improper document destruction remained a festering controversy within the Office of Special Counsel because the internal investigations that were done lacked credibility with many of the attorneys working on the Proposed Remedial Order cases. Moreover, these attorneys felt they were caught in an ethical dilemma because they were being asked to prepare discovery responses to questions about possible document destruction at a time when they were not confident that they were receiving accurate information about what had occurred.[42]

## 2. Ex Parte *Communications*

While remedial order proceedings are pending before OHA, "[n]o person who is not employed or otherwise supervised by [OHA] shall submit *ex parte* communications to the Director or any other person employed or otherwise supervised by [OHA] *with respect to any matter* involved in Remedial Order . . . proceedings."[43] *"[E]x parte* communications" are defined to include "oral or written communications *relative to the merits of a [PRO] . . . proceeding* pending before [OHA]."[44]

If any communication occurs that violates the provisions of this section [OHA] shall *promptly* make the substance of the communication available to the public and serve a copy of a written communication or a memorandum summarizing an oral

---

views and a review of relevant CPAD documents. Confidentiality was requested and given. The interviews were not made under oath, and the staff did not cross-examine the individuals involved.

**35.** *Id.* at 9, J.A. 1011.

**36.** *Id.* at 6, J.A. 1008.

**37.** *Id.*

**38.** *Id.* at 8, J.A. 1010.

**39.** *Id.* at 7, J.A. 1009.

**40.** *Id.* at 24, J.A. 1026.

**41.** *Id.*

**42.** *Id.* at 25, J.A. 1027. *See* note 51 *infra.*

**43.** 10 C.F.R. § 205.199F(a) (1981) (emphasis supplied).

**44.** *Id.* § 205.199F(b) (1981) (emphasis supplied).

communication to all participants in the affected proceeding.[45]

In handling the producers' discovery requests concerning the incidents of document destruction, and in conducting their investigations into these events, various OSC personnel engaged in numerous *ex parte* contacts with the Director of OHA. Paul Bloom's January 16 memorandum to Melvin Goldstein, the January 4 meeting of Tonken and Manasevit with Goldstein, and Goldstein's memorandum of the same date all were arguably in contravention of the prohibition contained in § 208.199F,[46] yet the contents of the written *ex parte* memorandum that were exchanged were not released until March 28.[47]

### 3. The Producers' Attempts to Obtain Meaningful Discovery

The producers did not immediately learn of these incidents of document destruction and were largely unaware of the *ex parte* communications until twelve Assistant Solicitors within OSC moved before OHA to "clarify the record" to include the various

*ex parte* memoranda concerning these events.[48] The producers filed over twenty discovery requests before OHA, seeking extensive deposition and document discovery into both of these incidents[49] and at one point requesting the Director of OHA to recuse himself from adjudicating the crude cluster proceedings.[50] OHA held several hearings on these discovery requests, but did not rule on them for several months. By the time OHA issued its decision concerning the discovery into document destruction and *ex parte* communications,[51] Gulf and ARCO had already filed a complaint in United States District Court. The sum total of the discovery OHA allowed consisted of two depositions concerning the August file reorganization and four interrogatories, designed by OHA, to be submitted to twenty-four named OSC attorneys and auditors.[52]

### B. Proceedings in the Courts

On March 27, 1980, Gulf and ARCO filed suit in district court for declaratory and

---

**45.** *Id.* § 205.199F(c) (1981) (emphasis supplied). "[OHA] may also take any other appropriate action to mitigate the adverse impact to any person whose interest may be affected by the *ex parte* contact." *Id.*

**46.** Appellants' argument that 10 C.F.R. § 205.-199F is inapplicable here because the substance of the communications did not "relate to the merits" of the PROs is not persuasive. Appellants cite no support for such a narrow construction of the word "merits." Furthermore, allegations of agency misconduct (*i. e.*, an order to destroy documents of arguable relevance to ongoing proceedings) relate in a very real way to the merits of an enforcement proceeding.

**47.** Counsel for Gulf, upon learning of the issues paper incident from a confidential source in December 1979, met twice with Paul Bloom and Melvin Goldstein about these matters, yet the transcripts of these *ex parte* meetings were not released to the other parties and made public until much later.

**48.** J.A. 1537. Although the motion was filed on behalf of the Office of Solicitor, neither Carl Corrallo nor Special Counsel Bloom signed the pleading. OSC served the producers with a *list* of the *ex parte* memoranda received by OSC from OHA relating to the incidents of document destruction. Citing 10 C.F.R. § 205.199F,

OSC urged OHA to "expeditiously issue an order regarding the consideration accorded the Tonken memo and the Bloom memo." J.A. 1540.

**49.** *See* note 19 *supra.*

**50.** J.A. 961.

**51.** April 28 order, *supra* note 17, J.A. 1699–1714.

**52.** Because Bloom substituted Jimmy Mayberry for Ron Rosapep at the earlier (November 1979) deposition, OHA allowed one representative of the producers to depose Rosapep, limited to the August file reorganization incident. *Id.* at 14, J.A. 1717. The interrogatories asked,

(1) Did you ever ask any individual to destroy any document or other material arguably related to the crude cluster proceedings?
(2) Were you ever asked to destroy any document or other material arguably related to these proceedings?
(3) Did you ever destroy or see anyone destroy any document or material arguably related to the proceedings?; and
(4) Explain any affirmative answer given to (1), (2) or (3).

*Id.* at 12–13, J.A. 1710–11.

injunctive relief.[53] On May 19, plaintiffs filed an amended and supplemental complaint to take into account the proceedings held by OHA since the date of their original complaint and the release during the interim of documents pertaining to plaintiffs' original allegations.[54]

In their amended complaint, plaintiffs requested the district court to enjoin the administrative proceedings and require DOE to prosecute the crude cluster proceedings in district court. As an alternative, plaintiffs sought an order prohibiting the Director of OHA from conducting the proceedings and ordering the Secretary of Energy to appoint an independent ALJ to adjudicate the proceedings, or at least the issues of document destruction and *ex parte* communications. Plaintiffs also sought document and deposition discovery to be *conducted by the district court* into the matters of document destruction of *ex parte* contacts, an order directing the defendants to preserve all documents that may be relevant to the crude cluster proceedings, and a declaration that the OHA Director's actions in receiving, soliciting and withholding *ex parte* communications were in violation of DOE regulations and violated the producers' due process rights. Plaintiffs asked the district court to retain jurisdiction over the proceedings to monitor the compliance with any order the court should issue.[55]

The defendants moved for a protective order deferring discovery and moved to dismiss the complaint for failure to exhaust administrative remedies and because the case was not yet ripe for review.[56] The plaintiffs opposed dismissal, arguing that immediate judicial intervention of some sort was necessary to preserve their right to a fair hearing before OHA and ultimately before FERC. The court initially met this argument with skepticism.[57] However, the court acknowledged that this case, unlike others relied on by defendants, involved more than mere allegations of document destruction and *ex parte* communications.[58]

On June 13, the court issued an order granting defendants' motion for a protective order and also requiring defendants to preserve in one location all documents arguably related to the crude cluster proceedings, pending disposition by the court of the motion to dismiss.[59]

The court on July 8 granted in part the relief requested by the producers. The court initially noted its reluctance to interfere with the ongoing crude cluster proceedings, and added that the "underlying facts have not been sufficiently developed to enable the Court to resolve the dispute even if it should intervene."[60] However, it stated, "[T]here is need at this time to put these issues to rest."[61] The court denied defendants' motion to dismiss, stating that

**53.** Plaintiff's Complaint, J.A. 1. Named as defendants were the Department of Energy, the Secretary of Energy, Charles W. Duncan (replaced by James B. Edwards), the Administrator of ERA, Hazel R. Rollins (replaced by Barton R. House), the Director of OHA, Melvin Goldstein (replaced by George P. Breznay) and the Special Counsel for Compliance Paul L. Bloom (replaced by Avrom Landesman). Edwards, House, Breznay and Landesman have been substituted as defendants pursuant to Fed.R.App.P. 43(c)(1).

**54.** J.A. 121–174. Chevron moved on May 23 to intervene as a party-plaintiff. J.A. 181–193. The district court permitted Chevron to intervene per order of June 19, 1980.

**55.** Plaintiffs' Amended and Supplemental Complaint at 51–53, J.A. 171–73.

**56.** J.A. 84–97; J.A. 229–263.

**57.** See Transcript of June 12 Hearing, at 3, 6–7, 15, 20, 23–24, J.A. 1764, 1767–68, 1776, 1781, 1784–85.

**58.** *Id.* at 49–50, J.A. 1810–11.

**59.** J.A. 1341. The court's June 13 order granted the relief plaintiffs sought in paragraph 4 of their complaint. See Plaintiffs' Amended and Supplemental Complaint, at 52 ¶ 4, J.A. 172. Appellants did not appeal this aspect of the June 13 order, and state that it has been complied with. Reply Memorandum in Support of Stay, at 5 n.3.

**60.** Memorandum and Order, Civil No. 80–0777, *Gulf Oil Corp. v. Department of Energy*, at 2–3 (D.D.C. July 8, 1980) [hereinafter "July 8 order"], J.A. 1759–60.

**61.** July 8 order, *supra* note 60, at 2, J.A. 1759.

Serious issues of fairness and due process are involved, however, and the Court believes it has a duty to assure at the very least that plaintiffs are not wholly denied an opportunity to develop facts supporting their claims.[62]

The court noted especially that "plaintiffs have no opportunity to test the issue of recusal or the proper scope of discovery until final consideration of the entire record on administrative appeal to [FERC] at the conclusion of all of the proceedings," an estimated wait of five years.[63] Therefore, the court directed the Secretary of Energy to appoint an independent ALJ "for the sole purpose of supervising such further document and deposition discovery as the [ALJ] determines is appropriate and reasonable to develop fully all facts concerning *ex parte* contacts with the hearing officer and any destruction of relevant documents by agency personnel...."[64]

Defendants filed an appeal in the Temporary Emergency Court of Appeals (TECA). The district court granted a stay pending reconsideration,[65] but ultimately denied reconsideration, although defendants argued that the intervening resignation of Melvin Goldstein as Director of OHA mooted the case, since the new hearing examiner was free to reconsider all previous OHA discovery rulings. The court saw no reason to believe that the departure of Goldstein brought DOE any closer to compliance with his order to develop an adequate record on the two issues of document destruction and *ex parte* communications. All OHA discovery rulings are made by a panel of three members, and Goldstein's successor, George Breznay, had been a non-dissenting member in all prior rulings in the crude cluster proceedings.[66] In its denial of reconsideration, the court removed any doubt that further judicial relief could be anticipated (including the possibility of direct supervision over the agency proceedings): it was repeatedly and emphatically stated that the sole purpose of the court's order was the preservation of an adequate administrative record on the alleged destruction of documents and *ex parte* comments.[67]

Defendants sought and obtained from TECA a stay pending appeal and filed a protective appeal in this court September 11, 1980.[68] TECA eventually dismissed the appeal for lack of jurisdiction,[69] and a mo-

62. *Id.* at 3, J.A. 1760.

63. *Id.* at 2, J.A. 1759.

64. *Id.* at 3, J.A. 1760. "All discovery shall be completed by October 1, 1980.... The parties shall report in person to the Court to indicate that full response has been made to this directive in open court ... on October 7, 1980." *Id.*

65. Defendants did not seek a stay until more than one month after the district court's July 8 order, and even then defendants sought a stay pending reconsideration without having filed a motion for reconsideration. This request went to Judge Penn who on August 14 directed defendants to file a motion for reconsideration and stayed the July 8 order pending a ruling on the motion. On August 20, defendants filed their motion for reconsideration and vacation of the July 8 order. A hearing on these motions was held September 5 before Judge Gesell.

66. Plaintiffs had, in their complaint, prayed that the Director of OHA *and his office* be removed from further participation as adjudicators for the entire proceedings (¶ 7) or alternatively for the two disputed issues of docu-

ment destruction and *ex parte* contacts (¶ 8). Plaintiffs' Amended and Supplemental Complaint at 52, J.A. 172.

67. Transcript of September 5 Hearing, at 9, 14–15, J.A. 1961, 1966–1967. The district court also vacated the stay and, adhering to the schedule set in the July 8 order, ordered that the "Defendants shall *promptly* comply with the terms and directives of the July 8, 1980, Order." Order, Civil No. 80–0777, *Gulf Oil Corp. v. Department of Energy* (D.D.C. September 8, 1980) (emphasis supplied), J.A. 1994. Judge Gesell added, "Anticipating your further action, I will deny any stay pending appeal." Transcript of September 5 Hearing, at 41, J.A. 1993.

68. This court by clerk's order of October 23 stayed proceedings in No. 80–2096 pending disposition of the case by TECA.

69. "[T]he appellate jurisdiction of this court embraces only issues arising under [ESA] or [EPAA], and we look only to the nature of the issue on appeal and not to the nature of the underlying case or controversy." *Gulf Oil Corp. v. DOE,* 639 F.2d 766, 766–67 (Temp. Emer.Ct.App.1981).

tions panel of this court granted a stay pending appeal and *sua sponte* expedited this case.[70]

## II. ANALYSIS

Appellants argue that the district court had no jurisdiction to entertain a suit to

---

**70.** Order, *Gulf Oil Corp. v. Department of Energy*, No. 80–2096 (D.C.Cir. March 5, 1981). Appellants also moved unsuccessfully for summary reversal January 30. Appellees on January 23 moved to dismiss the appeal for want of subject-matter jurisdiction, or alternatively, to summarily affirm the district court's July 8 and September 9 orders. Appellees argued that this court had no appellate jurisdiction over these orders because they established a discovery procedure ancillary to the pending court action, and therefore under a long line of precedent are themselves neither final judgments within 28 U.S.C. § 1291 nor orders granting injunctive relief within 28 U.S.C. § 1292(a)(1). In its March 5 order staying the district court's orders pending appeal, the motions panel denied all the parties' dispositive motions.

Appellees here renew their jurisdictional argument. For several reasons we are satisfied that this court has jurisdiction to hear and decide this appeal.

Appellees' argument that the district court's order set up a discovery procedure ancillary to the pending court action is inconsistent with the court's own stated intentions. Appellees refer to the extensive relief requested in their complaint as well as language in the July 8 order that suggests the district court has not yet "finished its business." Brief for Appellees at 19–20. Although at argument counsel for ARCO conceded that Judge Gesell's intent *at this time* was solely to develop and preserve a record through this *ad hoc* method of discovery, he argued that the district court would be "obliged" to do whatever was necessary to remove the taint from the crude cluster proceedings should the ALJ's discovery reveal misconduct prejudicial to the producers' defense.

But even if the district court may initially have entertained the notion of granting further relief, the court made it abundantly clear at the September 5 hearing that it had "finished its business." *See* text at note 67 *supra*. In fact, all the court did here was to set up a mechanism for discovery *ancillary to the administrative proceedings*, not to any court action. An order compelling discovery in an agency proceeding is final and appealable under 28 U.S.C. § 1291. "[T]he proceeding before the district court is not ancillary to any judicial proceeding. So far as the court is concerned, it is complete in itself." *Cobbledick v. United States*, 309 U.S. 323, 330, 60 S.Ct. 540, 543, 84 L.Ed. 783 (1940); 9 *Moore's Federal Practice* ¶ 110.13[2], at 157 n.20 (2d ed. 1980).

This court also has jurisdiction of appeals from interlocutory orders granting "injunctions." 28 U.S.C. § 1292(a)(1) (1976). We

agree with appellants that the court's July 8 order is such an injunction. *Cf. Green v. Department of Commerce*, 618 F.2d 836 (D.C.Cir. 1980) (interlocutory order in FOIA case, ordering companies that submit boycott reports to be notified of agency disclosure of the documents held nonappealable).

> This is not . . . an "injunction" for purposes of Section 1292(a)(1): it does not affect the rights or behavior of parties outside of the litigation, and does not differ from any other time-consuming requirement imposed on litigants by courts in the interest of obtaining full information.

618 F.2d at 841. *See also Socialist Workers 1974 National Campaign Committee v. Jennings*, 567 F.2d 1133 (D.C.Cir.1977) (district court order requiring the FEC to compile a factual record concerning harassment of the SWP held nonappealable "as an *ad hoc* method of fact finding . . . in the nature of an instruction to a master to prepare a record and finding, which order is not appealable").

The *Green* and *Socialist Workers* orders were, however, only incidental measures to the resolution of substantive issues which remained before the court. Not so here where the district court evidenced a clear intention not to get into the substantive issues involved in the agency proceeding.

Mandatory orders affecting preliminary agency action have generally been held to be appealable as injunctions under § 1292(a)(1). *NLRB v. Interstate Dress Carriers, Inc.*, 610 F.2d 99 (3d Cir. 1979) (order preventing NLRB from counting ballots in representative election or certifying a bargaining agency for specified period of time); *American Motors Corp. v. FTC*, 601 F.2d 1329, 1331 (6th Cir. 1979) ("terms, intent, and effect of the order are such as to halt an investigation by an administrative agency for an indefinite period of time"); *Parents Comm. of Public School 19 v. Community School Board*, 524 F.2d 1138, 1141 (2d Cir. 1975) (order requiring disclosure and production of material and identification, at considerable expense, through testing of children potentially in need of bilingual education).

Finally, we cannot help but note the irony of appellees' argument that we lack the power to review the district court's actions. It is appellees who have strenuously urged a pragmatic and flexible approach to finality in evaluating the propriety of Judge Gesell's order because they would suffer from the delay. But now they would have us adopt a far more rigid approach to finality when deciding whether we may review the district court's action. We decline to do so.

issue its July 8 order because the agency proceeding was still ongoing, and judicial intervention in an ongoing proceeding is barred by the twin doctrines of exhaustion and ripeness. Appellants urge that the language and background of section 503 as well as the regulations promulgated pursuant to it require that appellees pursue their cause within the agency until a final order is approved or disapproved by FERC—a course estimated to take several years—before any kind of judicial relief is authorized. Appellants also argue lack of ripeness since it is basically the limited discovery rulings and failure of the OHA director to recuse himself that are being challenged. These interlocutory rulings are not final agency actions, and any deleterious effect they may have on the proceeding could be washed out by FERC's ultimate decision to approve or not to approve a remedial order.

Appellees' answer to both claims is that although exhaustion and ripeness are normally predicates for judicial review, the facts here make out a highly compelling case for earlier intervention. The proceeding is not expected to end for five years. A delay of that length will irreparably impair the producers' attempt to develop their major defense. Moreover, they claim, years hence it will be impossible to reconstruct the proceeding to support their allegations of basic structural defects and infirmities. Thus, appellants argue, delay will cause them irremediable injury by depriving them of substantial procedural rights. They also point to prior cases in which courts have allowed limited exceptions to traditional finality and ripeness criteria to protect litigants from "structural flaws" and "fundamental infirmities" in ongoing agency proceedings. In such cases courts have found judicious judicial intercession essential to ensure that the parties will eventually have an adequate remedy at law when the agen-

cy action is finally complete and ready for fullscale judicial review.

Appellants counter that if such intervention is ever necessary it must be limited to those situations where the court makes findings that actual wrongdoing has taken place, something it did not do here. And, appellants add, even conceding that some of the agency personnel's conduct did violate its own regulations, circumstances have sufficiently changed since the court's controversial order was issued to require its vacation now in light of those changed circumstances.

We conclude that the district court was justified on the basis of the evidence presented to it in intervening to assure that a full factual record of any misconduct would be preserved for use by the agency itself in the ongoing proceedings as well as for any later judicial review of that action. We believe the district court accurately appraised the situation and acted in an appropriately limited way to protect the litigants' rights to a fair proceeding. However, we also find that subsequent events have sufficiently reduced the threat of substantial loss of those rights so that intervention by the court is no longer needed. Because of those changed circumstances, we vacate the court's order. Since in our view these new developments do not moot the controversy but rather alter our perception of the need for judicial intervention, and in view of the recurrent and varied situations in which we are presented with appeals from ongoing agency actions, we have decided to explain the reasons why we think the district court's unusual action in this case was originally justified.

### A. The Trial Court's Order and the Exhaustion Requirement [71]

■ The Department of Energy Organization Act does not explicitly require ex-

---

71. Although "the requirements of finality and exhaustion are inextricably intertwined, both . . . designed to avoid premature disruption of agency proceedings," *American Dairy of Evansville, Inc. v. Bergland*, 627 F.2d 1252, 1260–61 (D.C.Cir.1980), the two doctrines are "analytically distinct. One requirement may be applicable even when the other is not." *Asso-*

*ciation of National Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1177 (D.C.Cir.1979) (Leventhal, J., concurring), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980). *See FTC v. Standard Oil Co.*, 449 U.S. 232, 101 S.Ct. 488, 495, 66 L.Ed.2d 416 (1980) ("We think, however, that Socal and the Court of Appeals have mistaken exhaustion for finality."). We there-

**308**

haustion as a jurisdictional prerequisite to judicial review. Nevertheless, appellants argue that an exhaustion requirement is implicit in, and necessary to, the administrative scheme set up in § 503 to handle enforcement of remedial orders. Section 503 provides an elaborate administrative process to challenge remedial orders before permitting judicial review of those orders. A recipient of a remedial order issued by OHA must appeal to FERC within 30 days or forfeit any and all other administrative and judicial review.[72] Only after the decision by FERC may a recipient challenge in district court the remedial order *as finally promulgated by FERC* (not OSC, not OHA, and not the Commission's ALJ). Further-

more, a regulation promulgated by the Secretary under the Act[73] expressly requires that: "Any order issued by the Office of Hearings and Appeals with respect to discovery shall be subject to further *administrative* review or appeal only upon issuance of a final remedial order."[74] The administrative orders centrally involved in plaintiffs' challenge in the district court consist of repeated denials of discovery into the document destruction and *ex parte* contacts incidents and the refusal of the Director of OHA to recuse himself from the case. Although we do not read section 503 itself as denying judicial review in all circumstances of any agency action that precedes a remedial order,[75] DOE's regulation certainly an-

---

fore proceed to discuss each doctrine separately, although our analysis will overlap to some degree.

**72.** Section 503(b) of the Act, 42 U.S.C. § 7193(b); 10 C.F.R. § 205.199C(e) (1981). Upon notice of appeal to FERC, the remedial order is automatically stayed pending review unless FERC finds that the public interest requires immediate compliance. The party upon request is entitled to an oral as well as written hearing before an ALJ with discovery permitted beyond that allowed in the OHA hearing, 18 C.F.R. § 1.24, 1.38(h) (1980), and with such cross-examination as the Commission deems necessary. Section 503(c) of the Act, 42 U.S.C. § 7193(c). Review of the ALJ's decision is by the full Commission. 18 C.F.R. § 1.38(e)(7) (1980). The Commission shall thereafter issue an order, based on findings of fact, affirming, modifying, or vacating [OHA's] remedial order, or directing other appropriate relief, and *such order shall, for the purpose of judicial review, constitute a final agency action....*" Section 503(c) of the Act, 42 U.S.C. § 7193(c).

Section 503(e) of the Act states in full that Nothing in preceding provisions of this section shall be construed to affect any procedural action taken by the Secretary prior to or incident to initial issuance of a remedial order which is the subject of the hearing provided in preceding provisions of this section, *but such procedures shall be reviewable in the hearing.*
42 U.S.C. § 7193(e) (emphasis supplied). FERC orders issued pursuant to § 503 of the Act are reviewable in the district courts. Section 502(b) of the Act, 42 U.S.C. § 7192(b).

**73.** "Intra-agency appeals are not a prerequisite to judicial review except to the extent statutes *or appropriate agency rules* command otherwise." *United States v. Consolidated Mines & Smelting Co.,* 455 F.2d 432, 440 (9th Cir. 1971)

(construing third sentence of § 10(c) of APA, 5 U.S.C. § 704(c) (1976) (emphasis supplied).

**74.** 10 C.F.R. § 205.198(i) (1980) (emphasis supplied).

**75.** In *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), cited to us by appellants, the Court found that Congress in § 405 of the Social Security Act expressly withdrew all jurisdiction from the courts until such time as the Secretary issued a final decision after a hearing. In § 405(g), Congress provided that "[a]ny individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision...." In § 405(h), Congress specified that "[n]o action against the United States, the Secretary or any officer or employee thereof shall be brought under [§ 1331 *et seq.*] of Title 28 to recover on any claim arising under [Title II of the Social Security Act]." 422 U.S. at 756, 763, 95 S.Ct. at 2462, 2465. In appellees' words, "*Salfi* is strong evidence that Congress knows how to withdraw jurisdiction expressly when that is its purpose." Brief for Appellees at 31.

See *Texaco, Inc. v. DOE,* 490 F.Supp. 874, 884 (D.Del.1980):

The Supreme Court's opinion in *Salfi* does not support the DOE's position, that, under the DOEA, agency action is not judicially reviewable until the FERC has ruled on an appeal of a RO.... [T]he [Social Security] Act not only conditioned the availability of judicial review under Section 405(g) on the issuance of a final decision by the Secretary, but also foreclosed all other bases of federal jurisdiction under § 405(h).

ticipates that discovery challenges will not be brought to court unless and until FERC issues a final remedial order. Indeed such a requirement is entirely reasonable in the vast majority of cases.

The time-honored purposes of exhaustion—to allow an agency to make a record, apply its expertise, and correct errors in its own processes as it goes along[76]—do not seem particularly well served here where the district court was dealing with an agency proceeding in which it had reason to believe something may have gone fundamentally awry with the way in which the proceeding itself was being conducted, something that transcended dubious or even patently erroneous legal rulings. The statutory scheme of § 503 and the regulations promulgated thereunder may make for efficient management of 99 percent of proceedings challenging discovery rulings, but they do not necessarily prove adequate for the aberrational one percent that involves significant allegations and not insubstantial evidence of document destruction. An inflexible adherence to normal exhaustion requirements in such a case might—if the allegations were substantiated—perpetuate rather than prevent injustice.

### B. *Ripeness*

■ Appellants also argue that the issues here are not "ripe" for review. The Supreme Court stated in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967):

---

In its discussion of exhaustion, the *Texaco* court also stated that "the statutory exhaustion requirement contained in Section 503(c) does not apply to [extra-enforcement review of DOE regulatory pronouncements upon which the enforcement proceeding is predicated] and ... nothing else in the DOEA purports to preclude them." 490 F.Supp. at 885. It is only when "plaintiffs seek[ ] ... relief from the ongoing DOE compliance proceeding" that the exhaustion mandated by § 503(c) applies with full force and "the controversy would be unripe for judicial review." *Id.* at 887. Because the producers are, in one sense, "seeking relief from the ongoing DOE compliance proceeding," appellants rely on this passage in *Texaco* in support of their contention that § 503 contains a jurisdictional prerequisite of exhaustion the courts cannot excuse. But the court presupposed that the interlocutory agency action sought to be reviewed "would inflict no concrete hardship on plaintiffs," a supposition which cannot be made here. *Id.* The court nonetheless dismissed as unripe a claim seeking a judicial determination of the validity of OSC theories of the definition of "property" in its application of the EPAA regulations. The court found that because Texaco "has failed to show that the DOE regulations it challenges place it on the horns of a pricing dilemma or have any other impact upon it of the kind required by the ripeness doctrine, its claims with respect to the validity of the regulations will be dismissed." 490 F.Supp. at 889.

*Cf. Keystone Fuel Oil Co. v. DOE*, 4 Energy Mgmt.Rptr. (CCH) ¶ 26,244 (D.D.C. October 23, 1980), in which the district court stated without discussion that § 503, like § 405 in *Salfi*, provided a mandate for exhaustion that could not be abrogated by the courts. 4 Energy Mgmt.Rptr. (CCH) ¶ 26,244 at 27,979. However, plaintiff's suit in *Keystone* challenged the substantive validity of an NOPV and PRO, the exact kind of challenge for which Congress did require exhaustion in § 503.

76. *Parisi v. Davidson*, 405 U.S. 34, 37, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972). Application of the tripartite test here produces inconclusive results. In this case, appellees have consistently sought a fuller and more adequate record for review; indeed it was their failure to obtain it from the agency that sparked this bold move in the district court and convinced the trial judge to act as he did to remove discovery on two discrete issues involving document destruction and *ex parte* communications from the mainstream of the § 503 proceeding.

The need for agency expertise is not particularly relevant here. Questions of the propriety of *ex parte* communications or document destruction are not within the province of any special agency's "expertise"; indeed they are familiar fare for judicial oversight. *See Association of National Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1157 (D.C.Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980).

The third reason for exhaustion—to allow an agency to "correct its own errors"—does have relevance here but would not have been by itself persuasive enough to counter-balance the factors militating in favor of limited intervention at the time the district court issued the order. Whether OHA would open up further discovery was questionable at best even after the Director of OHA who was involved in the *ex parte* communications stepped down. The district court, in denying reconsideration of its July 8 order in September 1980, found that fact alone not dispositive in ruling out the need for specially supervised discovery on the impropriety issues.

[T]he basic rationale [of the ripeness doctrine] is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. *The problem is best seen in a twofold aspect requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.*[77]

In contrast with exhaustion which focuses on the agency's primary responsibility to decide controversies, ripeness is imposed to assure that the issues are "fit for judicial resolution," *i. e.*, the questions are essentially legal rather than factual in nature,[78] and the challenged agency action is *sufficiently final* to assure that a real controversy exists. 387 U.S. at 149, 87 S.Ct. at 1515.

### 1. *The Degree of Finality Required for Review*

Appellants argue that because the rulings appellees challenge are admittedly not "final agency action," they are not ripe for

review and the district court was without jurisdiction to entertain this suit.[79] But, although finality is a weighty factor in judging ripeness, it is not an indispensible one.

In determining whether an order is *sufficiently final* for purposes of judicial review, "the relevant considerations . . . are whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action."

*American Dairy of Evansville, Inc. v. Bergland*, 627 F.2d 1252, 1260 (D.C.Cir.1980) (emphasis supplied), *quoting Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970).[80]

■ Appellants contend that finality is necessary in this case because Congress intended there be judicial review only of final remedial orders, an intent expressed in § 503(c) which says that "such order shall, for the purpose of judicial review, constitute a final agency action . . ." Appellants support this preclusive interpretation of

**77.** 387 U.S. at 148–49, 87 S.Ct. at 1515 (emphasis supplied); K. Davis, *Administrative Law Treatise* § 21.00 (1980 Supp.) ("Controversies are now ripe for judicial determination when the legal issues are appropriate for courts to decide and when the hardship to private parties from lack of decision is substantial.").

**78.** The issues presented by appellees in their complaint to the district court were definitely legal ones involving the propriety of the conduct of the agency counsel and trier of facts. The district court's response was carefully framed to avoid any interference in the merits of the enforcement proceeding and was restricted to setting out a requirement for an agency-affiliated ALJ to develop a factual record of what that conduct had been.

**79.** Section 10(c) of the Administrative Procedure Act, 5 U.S.C. § 704, which provides in part that

    Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling

not directly reviewable is subject to review on the review of the final agency action, does not apply to the functions exercised by DOE under § 207(a) of the ESA, 12 U.S.C. § 1904. Section 207(a) is incorporated by reference into the EPAA, 15 U.S.C. § 754(a)(1). *See* note 4 *supra*. In *Coastal States Gas Corp. v. DOE*, 495 F.Supp. 1300, 1304–05 n.4 (D. Del.1980), however, the district court interpreted the "case or controversy" requirement of § 211 of the ESA to mean that the courts must still accommodate the doctrines of exhaustion and finality. A court may of course as a prudential matter refrain from reviewing nonfinal agency action.

**80.** We have previously defined an order as "final" for purposes of judicial review when it "impose[s] an obligation, den[ies] a right, or fix[es] some legal relationship as a consummation of the administrative process." *Fidelity Television, Inc. v. FCC*, 502 F.2d 443, 448 (D.C. Cir.1974), *quoting Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948). Our pattern of analysis today does not differ in any material respect from this standard.

§ 503 with passages from the legislative history.[81] Our own review of the passages they cite to us, however, fails to convince us that such an intent existed. Neither the Conference Report[82] nor the statements and colloquies made on the floor contain more than oblique references to the availability of judicial review, and certainly nothing specifically indicating that Congress meant to rule out all judicial intervention before a final PRO is issued where the basic integrity of the agency proceeding is at issue.[83] In the absence of a stronger signal, we are hesitant to impute to Congress an intent to absolutely bar judicial intervention in advance of a final order.

Appellants also refer us to the Supreme Court's recent decision in *FTC v. Standard Oil Co.*, 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980).[84] In *Standard Oil*, the Court held that the issuance of an FTC complaint which precedes the administrative hearing and adjudication alleging "reason to believe" the Federal Trade Commission Act was being violated is not "final agency action" subject to judicial review. Again, the crucial difference between *Standard Oil* and this case is the nature of the judicial review sought. In *Standard Oil*, the plaintiffs sought an order requiring the FTC complaint to be withdrawn because it was issued as a result of political pressures and on the basis of insufficient evidence. Here, appellees are not in court challenging OSC's proposed remedial order or asking for its withdrawal. They want help in getting the proceeding tried fairly.

■ Indeed the Supreme Court in *Standard Oil* assumed that "a record which would be inadequate for review of alleged unlawfulness in the issuance of a complaint *can be made adequate" by judicial remedy after the administrative process has run its course.* 101 S.Ct. at 496 (emphasis supplied). The district court here, however, determined it could not make such an assumption because of specific allegations and evidence of record destruction, and on the facts before it, we are not disposed to differ with its conclusion. Thus we conclude that, despite the lack of a final order, the dispute over the need to preserve a record as to alleged agency wrongdoing was sufficiently urgent and the issue sufficiently joined to meet the ripeness requirement.

2. *Hardship to the Parties if Review is Withheld*

■ The expected hardship to the appellees from withholding judicial insight at this juncture of the agency proceedings was the major predicate for the district court's July 8 order. Of course, the district court had no way of accurately predicting just how much postponement of judicial relief for several years would affect the capability of the producers to defend against their estimated potential liability of 1.7 billion dollars, nor whether insisting they play to the end what might be a fundamentally flawed proceeding at high financial cost to themselves (and to agency resources) would result in only a second equally expensive and time-consuming go-round with the agencies and the court. Such is the stuff of which district court judgments are made. We do believe, however, appellees made a sufficient showing before the district court that review five years later would likely not be adequate to protect substantial and substantive rights they concomitantly showed to be in danger.

---

81. Brief for Appellants at 21–25.

82. "Following action by the Commission on the appeal the decision will be reviewable as a final agency action in federal court in accordance with pre-existing law." H.Conf.Rep. No. 539, 95th Cong., 1st Sess., *reprinted in* [1977] U.S. Code Cong. & Ad.News 854, 956. Appellants in their Brief at 24, dress this inconclusive quote in misleading garb. Nothing in the Conference Report states that *no* judicial review is *ever* available prior to the issuance of a remedial order by FERC.

83. Senator Javits' statements (Brief for Appellants, at 22–23) as to the timing and availability of judicial review concern only review of the "reasonableness" of the actions taken within DOE, and do not discuss the unique situation facing appellees here (which does *not* directly concern whether issuance of a remedial order is "reasonable").

84. Brief for Appellants at 27 n.16.

While the injury here is not like that of a typical party seeking pre-enforcement review of administrative action,[85] the immediate and long-term harm to appellees' interests could be just as great.[86] The nature and cognizability of that harm has been defined by a series of decisions of this court permitting interlocutory review of nonfinal administrative action where the agency proceedings suffer from a fundamental infirmity requiring a court to act immediately to protect appellees' rights to a fair proceeding. *Association of National Advertisers, Inc. v. FTC*, 627 F.2d 1151 (D.C.Cir. 1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980) (bias in rulemaking proceeding); *Fitzgerald v. Hampton*, 467 F.2d 755 (D.C.Cir.1972) (denial of a public hearing); *Amos Treat & Co. v. SEC*, 306 F.2d 260 (D.C.Cir.1962) (bias in adjudicatory proceeding). In these and other opinions, we have made it clear that "judicial intervention in uncompleted administrative proceedings, as distinguished from judicial checking by statutorily-established method of review, must remain very much the exception rather than the rule." *Nader v. Volpe*, 466 F.2d 261, 268 (D.C.Cir.1972); *Association of National Advertisers, Inc. v. FTC*, 617 F.2d 611, 621–22 (D.C.Cir.1979).[87]

**85.** *Abbott Laboratories v. Gardner*, 397 U.S. 136, 152, 87 S.Ct. 1507, 1517, 18 L.Ed. 681 (1967) (prescription drug regulations); *National Wildlife Federation v. Costle*, 629 F.2d 118, 127 (D.C.Cir.1980) (permit application activities of Army Corps of Engineers); *Midwestern Gas Transmission Co. v. FERC*, 589 F.2d 603, 622–25 (D.C.Cir.1978) (conditional authorization of importation of natural gas).

**86.** Appellees argue that substantial delay in obtaining a full record of what went on during the alleged destruction and "cover-up" will entail a great risk of losing the evidence altogether, given the rapid turnover and widespread dispersion of agency personnel, as well as the dimming of bureaucratic memories. In addition, if a pattern of wrongdoing really did exist, it would almost certainly carry with it the danger of possible disappearance altogether of relevant material. As Chief Judge Robinson has stated, "[O]rdinarily exhaustion may be excused by delay when time is vital to the preservation of substantial rights." *American Dairy of Evansville*, 627 F.2d at 1270 (Robinson, J., dissenting). Mindful that exhaustion is usually required even though errors critical to the validity of a result occur early in the proceeding, the nub of this case is whether the evidence of possible wrongdoing before the district court rose to the requisite level to support his most unusual but still quite limited action in ordering that a separate ALJ take evidence on the incidents of document destruction and *ex parte* communications. We believe it did.

We are aware that several district courts have held that pre-PRO actions by FERC are not final enough to permit review. *Coastal States Gas Corp. v. DOE*, 495 F.Supp. 1300 (D.Del.1980); *National Distillers and Chemical Corp. v. DOE*, 498 F.Supp. 707 (D.Del.1980); *Keystone Fuel Oil Co. v. DOE*, 4 Energy Mgmt. Rptr. (CCH) ¶ 26,244 (D.D.C. October 23, 1980); *Texaco, Inc. v. DOE*, 490 F.Supp. 874 (D.Del.1980); *Southwestern States Marketing Corp. v. DOE*, C.A. No. 1–79–54 (N.D.Tex. January 26, 1980); *Diversified Chemicals & Propellants Co. v. FEA*, 432 F.Supp. 859 (N.D.Ill. 1977).

But see *State of Louisiana v. DOE*, 507 F.Supp. 1365 (W.D.La.1981). In this case the court held ripe for review the State of Louisiana's extra-enforcement challenge to DOE's interpretations of its definition of "property." The court there distinguished *Texaco, Inc. v. DOE*, finding that the state of Louisiana presently was being deprived of lost royalties and tax revenue due to the DOE's several interpretative rulings, and concluded that "only prompt resolution of the overriding legal question . . . can alleviate any injury that Louisiana has experienced as a result of DOE's action." 507 F.Supp. at 1374.

Appellees here are neither seeking judicial review of the sufficiency of the evidence supporting PROs (*National Distillers; Keystone Fuel*), nor are they contesting the theories DOE has employed in defining "property" (*Texaco; State of Louisiana*). (Their discovery before OHA was directed at uncovering these theories.) Although Coastal States also alleged OHA had engaged in improper *ex parte* contacts with OSC, the court there found that delaying resolution of this issue until a final order by FERC would not cause hardship substantial enough to present due process concerns.

**87.** In *Association of National Advertisers*, a group of advertisers and trade associations filed suit in district court seeking review of a special set of rules promulgated by the Federal Trade Commission for use in the Commission's rulemaking proceeding concerning children's television advertising. Plaintiffs alleged, *inter alia*, that the new rules were issued in violation of 5 U.S.C. § 553 (notice and comment), without statutory authority, and that existing rules permitting *ex parte* communications violated the plaintiffs' statutory and constitutional due process rights. The district court dismissed the

Judge Leventhal, concurring in *Association of National Advertisers*, 627 F.2d 1151 at 1180, wrote:

> [A] federal court, district or appellate . . . [may] take jurisdiction before final agency action, . . . in a case of a "clear right" such as outright violation of a clear statutory provision [citing *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958)] [88] or violation of basic rights established by a *structural flaw*, and not requiring *in any way* a consideration of interrelated aspects of the merits—which can only be done appropriately on review of a final order.

(Emphasis in original.)

*See also Thermal Ecology Must Be Preserved v. Atomic Energy Commission*, 433 F.2d 524, 526 (D.C.Cir.1970) ("An agency's procedural or evidentiary rulings do not justify judicial review except in extreme instances where the action is held to constitute an effective deprivation of appellant's rights").[89]

■ In sum, we have here a combination of (1) serious allegations originating in the agency itself of document destruction and prohibited *ex parte* communications between adjudicator and enforcement counsel, (2) backed by admissions of agency personnel that some such actions had already taken place, (3) along with a history of extremely restrictive discovery permitted to the parties to explore the extent of alleged document destruction or their cover-up and (4) the unavailability for an estimated five years under the agency's procedures of any judicial review of proceedings of massive scope and complexity. The totality of these circumstances in our view permitted the district court to make an exception to the normal exhaustion, finality, and ripeness rules and justified its limited order requiring that an agency-appointed ALJ conduct discovery into the allegations and report back to the court.

## III. CHANGED CIRCUMSTANCES SINCE THE ISSUANCE OF THE DISTRICT COURT ORDER

■ Mindful that the predicate for the type of limited relief the district court granted in this case is a substantial showing of possible agency misconduct *and* that without immediate review, such misconduct is likely to prejudice the right of parties before the agency, we believe that the relief the court ordered is no longer necessary. Several critical events have occurred since the district court issued its July 8 order.

In September 1980, Melvin Goldstein resigned as Director of OHA. Paul Bloom, Special Counsel for Compliance, left DOE at the close of the prior Administration in January 1981. Counsel for appellees conceded at argument that the first reported incident of document destruction, involving CPAD "Division" files, has turned out to be "inconsequential" and is no longer of major concern to them. DOE released pursuant to a FOIA request an unexpurgated copy of the issues paper on the eve of argument in this case. All the written *ex parte* commu-

---

complaint as premature, and we affirmed. "[A]ppellants' request for relief would require us to engage in an essentially abstract discussion" of these issues. 617 F.2d at 620–21. Following *Nader v. Volpe, supra*, the court acknowledged that "nonstatutory remedies to correct allegedly unlawful agency action are generally unavailable unless the challenged action is *ultra vires* or beyond the capabilities of the statutorily-prescribed methods of review to repair." *Id. See* text at note 85 *supra*. The existence of a statutory review procedure evinces Congressional intent to confine judicial review to those procedures, *"assuming they apply to the claims at hand. [] The assumption is important, for a court must always determine whether the statutory remedies encompass the challenging party's claims and will* provide *that party with adequate relief upon review." Id.* (citation omitted) (emphasis supplied).

**88.** Footnote added. We are not presented here with the *Leedom v. Kyne* exception to finality. Appellees do not point to any clear and unambiguous *statutory* mandate underlying their claim.

**89.** *See also Nader v. Volpe*, 466 F.2d 261, 269 (D.C.Cir.1972) ("There are, to be sure, exceptional situations in which a litigant has been permitted to invoke the equitable powers of a district court to preserve a substantial right from irretrievable subversion in an administrative proceeding. . . .").

nications of which the producers had been apprised by the agency have been released to them. The only items left to pursue in any discovery proceedings would be possible annotations made by various OSC personnel on their copies of the issues paper and possible oral *ex parte* communications between Bloom and Goldstein, neither of whom are any longer involved in the proceedings. The issue of Goldstein's recusal of course became moot on his withdrawal from the agency.

These altered circumstances drastically change the factual predicate on which the district court based its determination that the proceeding was sufficiently flawed so as to impose an intolerable danger of irremediable harm on the litigants, unless it ordered evidence of alleged unlawful conduct preserved. The individuals involved in both the *ex parte* communications and the orders to substitute deponents and limit responses to interrogatories have departed the scene; there is a new chairman of OHA who will preside at the rest of the § 503 proceeding; and there will presumably be a new member untainted by the disputed conduct of the three-person panel. Although not all the questions have been answered or the tangled skeins unraveled, there are no remaining substantiated allegations of document destruction or *ex parte* communications between officials on the case. The controversial issues paper—apart from possible notations—has been released in its entirety, thus foreclosing any notion that the producers' major defense has been critically impeded. Without more, we must conclude that there is no longer any structural flaw that justifies judicial intervention in what

we presume will be a fair and open § 503 proceeding from this point on.

Accordingly, we vacate the order of the district court under review.

*Vacated and remanded.*

GINSBURG, Circuit Judge, concurring in the judgment:

Based on the considerations Judge Wald presents in Part III of the court's opinion—Melvin Goldstein and Paul Bloom have left their offices, the first incident of document destruction was concededly inconsequential, the Department of Energy has released the issues paper to the producers—I agree that court intervention is unwarranted at this juncture. While there are rare cases in which compelling reasons support judicial intervention in an ongoing administrative proceeding, I find no occasion to reach that issue in this case. It seems to me a close, and now moot, question whether the extraordinary action of the district court was an appropriate response to the unusual, shifting circumstances the parties' presentations indicated. I therefore concur in the judgment, without joining the court in expressing approval of the district court's directions to the Secretary, and would remand the case with instructions to dismiss the complaint.