## NATIONAL LABOR RELATIONS BOARD v. TEXAS MINING & SMELTING CO.

### No. 9539.

Circuit Court of Appeals, Fifth Circuit.

Jan. 4, 1941.

Rehearing Denied Feb. 1, 1941.

Robert B. Watts, Gen. Counsel, of Washington, D. C., and Alexander E. Wilson, Jr., of Atlanta, Ga., for National Labor Relations Board.

Nat B. King, of Laredo, Tex., respondent.

Before FOSTER, HUTCHESON, and HOLMES, Circuit Judges.

HOLMES, Circuit Judge.

The National Labor Relations Board found that the Texas Mining and Smelting Company, of Laredo, Texas, was engaging in unfair labor practices, in violation of Sections 8 (1), (2), (3), and (5) of the National Labor Relations Act, 29 U.S.C.A. § 158(1–3, 5). From the order entered upon the findings the Board brings this petition to enforce. Respondent contends that the order is not supported by the evidence, and also moves to remand the cause on the ground that the order of the Board is not bottomed on proper findings of fact as required by Sections 10(c) and 10(e) of the Act, 29 U.S.C.A. § 160 (c, e).

The motion to remand is without merit and will be denied. The findings made by the Board set forth clearly and elaborately the basic facts which prompted each finding, and the statements of ultimate facts left nothing to be desired. By the provisions of the act, the Board is required to consider all of the evidence in framing its opinion as to unfair labor practices; but it is only required to make a finding of the ultimate facts upon which the order is based. It is not required to set forth the conflicts in the evidence or to relate any facts which are contrary or immaterial to the finding made. When the ultimate findings are made, a presumption exists that they were made in accordance with the law. This presumption is not dissipated by the failure of the Board to relate all of the facts pertaining to the ultimate finding.[1]

Much of the evidence on the questions of unfair labor practices is not in dispute. Respondent is a Delaware corporation engaged in the processing and sale of anti-

[1] Cf. N. L. R. B. v. Waterman S. S. Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L. Ed. 704; N. L. R. B. v. Cherry Cotton Mills, 5 Cir., 98 F.2d 444.

mony. In August, 1937, the C. I. O. began to organize the International Union of Mine, Mill & Smelter Workers, Local No. 412. On November 14, 1937, the union, representing that it had a majority of the proper bargaining unit, sent a letter to President Henderson of the company, over the signatures of Jose Maria Gallagos and Isidro Cruz, its president and secretary, respectively, requesting recognition as the exclusive representative and bargaining agency of the employees, and proposing a conference. On November 16th, the company answered, requesting evidence of the existence of the union, the authority of its officers, its majority, and the citizenship and residence of its officers. The union immediately responded with a description of its organization, and offered its membership records for examination by any Board representative. On the 19th, the company asked for further evidence, and mentioned that the C. I. O. was a radical union which tried to dispossess aliens of their jobs.

On November 20th, Cruz and the subsecretary and dues collector of the union, Vasquez, were discharged. On November 23d, the plant was partially shut down. On the 24th, the union offered to supply the evidence requested by the company, and offered to let its membership cards be checked against the company payrolls by any impartial citizen of Laredo or by the company itself, stating that, if this procedure were denied, it would seek an election by the Board. This letter was signed by Cruz and a C. I. O. organizer. On the 26th, Henderson gave an interview to a Laredo newspaper, charging the C. I. O. with dishonesty, and calling it an organization having a policy of law-breaking, violence, and destruction; he hinted that the business could not operate with such an element in control. In the same issue of the newspaper, a large advertisement appeared warning the C. I. O. to keep out of Laredo.

On November 27th, the company refused the offers made in the letter of the 24th, on the ground that the two signers thereof were not then in the employ of the company. On that day, the Free Employees Association was organized. It was an independent labor organization formed by four employees, and joined, within eleven days, by a substantial majority of the regular employees in the bargaining unit. It elected a committee which, on December 8th, requested recognition as the bargaining agent. On December 9th, the company notified both labor organizations that it would hold an election to ascertain the proper bargaining agent. The union did not agree to it, and its membership was instructed not to vote. The ·election was held outside the company gates on December 11th by Judge Penn of the local county court, an assistant district attorney, and several deputy sheriffs; the F. E. A. received an overwhelming majority of the votes cast, and was· immediately recognized by the company as the bargaining agent. Two days later, Sunday intervening, the company resumed full operation, and made minor wage adjustments.

Against the background of these undisputed facts, we shall examine the conflicting evidence relating to each alleged unfair labor ·practice to determine whether the finding as to each is supported by substantial evidence.

■ Several employees testified that the union had in its possession signed union cards representing a majority of the appropriate bargaining unit on the dates that the requests for recognition were made to the company. The only reasonable objections advanced by respondent for its failure to negotiate involved its uncertainty that the union represented the majority it claimed, yet it refused the very liberal offer of the union to have this question impartially determined or determined by the company itself. President Henderson acknowledged from the witness stand that the newspaper account accurately quoted his views of and antagonism toward the C. I. O. It is well settled that such continuing refusals to negotiate or to consent to an impartial determination of representation, by a management actively antagonistic to a union, is such evidence as will adequately support a finding that the company has refused to bargain collectively. [2]

■■ The petition by which the F. E. A. was organized was circulated, according to the testimony of several employees, by Raphael Moreno on company time and property. Moreno, on occasions, occupied

[2] N. L. R. B. v. Remington Rand, 2 Cir., 94 F.2d 862; N. L. R. B. v. Express Pub. Co., 5 Cir., 111 F.2d 588; Solvay Process Co. v. N. L. R. B., 5 Cir., Jan., 1941, 117 F.2d 83.

a supervisory capacity as foreman of an unloading crew. Many employees testified that Moreno told them to sign his petition and withdraw from the union or they would have no more work. Some of them said that Moreno claimed to be acting under orders from the management in threatening that, unless the F. E. A. superceded the C. I. O. union, the company would move to Mexico. Cruz and Vasquez both testified that Mike O'Hara, a foreman in the plant, told them that the C. I. O. was a group of shameless rebels, bandits, and communists. The employees who testified about the actions of Moreno said that they signed the petition in order to keep work; that they preferred the C. I. O. According to Cruz and Vasquez, the reason given by the company for their discharge was "unionism." Although all of this testimony was sharply disputed and the company vehemently denied any acts of favoritism toward the F. E. A., the Board could, and evidently did, believe it. The manner in which the company unhesitatingly acted upon the requests of the F. E. A., when contrasted to its dilatory tactics in its dealings with the union, lends no credence to its denials. The Board considered this testimony in the light of all the evidence, and found that respondent had dominated and interfered with the formation and administration of the F. E. A., and had contributed support to it. There is no doubt that the evidence so relied on is substantial.[3] Nor can it be seriously questioned that such practices by the company interfered with, restrained, and coerced its employees in the exercise of their rights to organize and bargain collectively through representatives of their own choosing.[4]

The remaining challenged unfair labor practice is that the company discouraged membership in the union, and discriminated in regard to the hire and tenure of employment by discharging Cruz and Vasquez because of union activities. Cruz testified that the foreman O'Hara approached him

and made derisive and derogatory remarks about the C. I. O.; that O'Hara told him and Vasquez, who was with Cruz, that both would be discharged within twenty-four hours. One hour later they were notified to draw their pay. The time-keeper told them that they were discharged because of "unionism." They appealed to the vice-president to learn the reason, and were referred back to the time-keeper with the words, "Roberto knows all." Vasquez corroborated Cruz in every particular.

The company insisted that the men were discharged for continually leaving their work and molesting other employees; that none of the other testimony was true; that the act precipitating the discharges was a fight at lunch-time between these two and another employee. It was admitted that the men were satisfactory workers; that they had not been warned or reprimanded for any failure to perform their duties; and that they were given no hearing concerning the altercation. The employees denied the charges made by the company, and the testimony of these discharged union officers makes out a clear case of discharge because of union activities. The Board considered it true, and we are without jurisdiction to overturn its finding based upon the credibility of the witnesses.[5]

Since each of the findings is supported by substantial evidence, the only remaining matter for us to consider is whether the order predicated upon the findings effectuates the purposes of the act.[6] The only challenged portion thereof, which portion the Board concedes to be improper, is that requiring respondent to pay over to the appropriate fiscal agencies of the government sums equal to those received by the discharged employees as compensation for work performed on work-relief projects. The Supreme Court, in Republic Steel Corp. v. N. L. R. B., Nov., 1940, 61 S. Ct. 77, 85 L.Ed. ——, held that the Board was lacking in authority to impose such a requirement.

[3] N. L. R. B. v. Waterman S. S. Corp., supra; N. L. R. B. v. Leviton Mfg. Co., 2 Cir., 111 F.2d 619; N. L. R. B. v. Lane Cotton Mills, 5 Cir., 111 F.2d 814.

[4] International Association of Machinists v. N. L. R. B., Nov., 1940, 61 S.Ct. 83, 85 L.Ed. ——; N. L. R. B. v. Abell Co., 4 Cir., 97 F.2d 951; Solvay Process Co. v. N. L. R. B., supra.

[5] N. L. R. B. v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 630, 645, 81 L.Ed. 921, 108 A.L.R. 1352; Washington, etc., Coach Co. v. N. L. R. B., 301 U.S. 142, 147, 57 S.Ct. 648, 81 L.Ed. 965; N. L. R. B. v. Wallace Mfg. Co., 4 Cir., 95 F.2d 818.

[6] Sec. 10(c) of the National Labor Relations Act, 29 U.S.C.A., Sec. 160(c).

The motion to remand is overruled, the order of the Board is modified by striking therefrom the provision requiring payments to governmental agencies, and a decree will be entered directing that the order, as modified, be enforced.