NATIONAL LABOR RELATIONS BOARD
v. WEST TEXAS UTILITIES CO.
No. 9770.

Circuit Court of Appeals, Fifth Circuit.
May 2, 1941.

Rehearing Denied May 31, 1941.

Robert B. Watts, Gen. Counsel, and Laurence A. Knapp, Associate Gen. Counsel, National Labor Relations Board, both of Washington, D. C., and L. N. D. Wells, Jr., Regional Atty., National Labor Relations Board, of St. Louis, Mo., for petitioner.

· Scott Snodgrass of San Angelo, Tex., and A. K. Doss, of Abilene, Tex., for respondent.

Before FOSTER, HUTCHESON, and HOLMES, Circuit Judges.

HOLMES, Circuit Judge.

This is a petition to enforce an order of the National Labor Relations Board entered upon findings that the West Texas Utilities Company was guilty of unfair labor practices in violation of Sections 8(1), (2), and (3) of the Act.[1] The questions of dispute involve the jurisdiction of the Board over respondent, whether the findings are supported by the evidence, and whether the order entered is valid and proper.

Respondent is a Texas corporation engaged primarily in the production and distribution of electricity. Included among its customers are railways, communications systems, and pipe lines operating in interstate commerce; and one-sixth of its total output goes to Oklahoma consumers. Respondent not only engages in interstate commerce, but it also engages in intrastate commerce which affects interstate commerce, and, by either or both, it is brought within the jurisdiction of the National Labor Relations Act.[2]

The International Brotherhood of Electrical Workers began a drive to unionize the employees at respondent's San Angelo, Texas, plant in September, 1937. V. R. Quinlan, an employee, undertook to organize the workers, and a charter was acquired on October 5, 1937; Quinlan was then elected president of the union. When this came to the attention of F. W. Schroeder, the vice-president and general manager of the plant, he informed G. A. Hollowell, the production superintendent, of the activities. Hollowell and W. E. Huss, the chief engineer, took pains to advise Quinlan and other employees that union organizers were "evangelists" who took money in return for nothing; that the company would refuse to bargain with the union; and that it would not be sympathetic in its dealings with union employees. Employees testified that Huss profanely told them that, unless they stopped the union organization, every man was going to be fired, and that the company would spend $500,000 fighting the union.

Several witnesses testified that they had been shadowed and secretly watched by supervisory employees, who confessed to spying in order to prevent them from being "poisoned with union propaganda." At a conference with union representatives, Schroeder declared that it was respondent's policy to deal with its employees individually and not collectively. When the union filed charges against the company with the Board, the employees individually were warned to withdraw them under threats.

Quinlan, the president of the union and its most active supporter, had been employed at the San Angelo plant for nine years when, on November 22, 1937, he was transferred to its McCamey, Texas, plant. This was done to eliminate the employee "dissension and unrest" attributable to the union activities. For several reasons, the position at McCamey was not as desirable as that at San Angelo. Quinlan was subsequently discharged in July, 1938, because he left upon a week's vacation without notifying his foreman; he obtained permission to leave for M. E. Pittman, the manager. Quinlan's name was removed from the payroll and his place permanently filled, on the first working day

[1] 49 Stat. 452, 29 U.S.C.A. § 158 (1), (2), (3).

[2] Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; Southern Colorado Power Co. v. N. L. R. B., 10 Cir., 111 F.2d 539; N. L. R. B. v. Gulf Public Service Co., 5 Cir., 116 F.2d 852. Cf. Houston, E. & W. Texas Ry. Co. v. United States, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341; Troppy v. La Sara Farmers Gin Co., 5 Cir., 113 F.2d 350.

after his departure, under orders from Pittman; no inquiry or investigation as to Quinlan's whereabouts was made. Pittman said that Quinlan had quit, and he refused to reinstate him when he returned at the end of his vacation.

These facts, without the narration of others of similar import, amply support the findings made by the Board that respondent had violated Sections 8(1) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(1), (3). It is clear that the management was not only openly hostile to any form of affiliated union organization, but also that it freely exerted its efforts and influence to persuade, coerce, and intimidate the employees in the exercise of their rights under the Act;[3] and when the discharge of Quinlan, the union leader, is viewed against the background of the notorious antagonism to the union, the conclusion reached by the Board that he was discharged because of union activity is more than plausible.[4]

■ The Board also found that W. H. Wills and R. S. Elder were discharged for union activity. The evidence relating to these discharges we do not find to be substantial. Wills was active in the union, and became vice-president in charge when Quinlan was transferred. He paid no attention to the words and actions of the supervisory employees against the union, but remained loyal to it. In December of 1937, Wills was transferred from the switchboard to the repair and maintenance gang, despite his protests that he was physically unsuited for rough work. He claimed to have suffered an injury while performing his new duties, which was sustained on the day following his transfer. Examinations by physicians disclosed no evidence of any injury, and led the doctors to believe that the trouble was tuberculosis. When Huss was told the results of the doctors' examinations, he discharged Wills, telling him that his failure to cooperate with the company in his switchboard duties had caused his transfer, and that his condition did not result from any injury. The only response made by Wills was "Okeh, Chief."

Wills acknowledged that his transfer had been contemplated by the company more than once in previous years, and the only direct testimony dealing with the reason for the transfer is that Wills failed to cooperate with the engineer and fireman on his shift in regard to notifying the other men of the load signal given by the dispatcher. Before his notification of discharge, he filed a claim for workmen's compensation, and alleged that he was totally and permanently disabled.

■ R. S. Elder, an employee of ten years' standing, was a charter member of the union, and was a member of its executive board. In January, 1938, the management was informed that he was stealing small quantities of gasoline from the company. He continued to take gasoline until, on April 19, 1938, Huss had personally observed him stealing, and had affidavits of several employees attesting the thefts; Elder was confronted with his misconduct, which he failed to question or deny, and he was discharged.

The facts that Wills and Elder were prominent members of the union and the company was antagonistic to it do not sufficiently support the Board's finding that their discharges were responsive to the union activities of the men. The only positive testimony in the record is that the only considerations which actuated the discharges were the thefts by Elder and the failure to cooperate and pretended injury of Wills; that no consideration of their membership in the union contributed in any way to the discharges. The reasons given were confessedly true, and were ample to warrant the discharges. We think that the misdeeds of Wills and Elder stand alone as the reason for their discharges, and that the inference drawn by the Board is without substantial support.

■ The final violation was respondent's alleged domination of and interference with the formation of a local association called the "Committee." We think this finding has ample support. Its organization had its inception at a time when the union was in obvious disfavor;[5] the preference of the company for an in-

---

[3] International Association of Machinists v. N. L. R. B., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. ——; N. L. R. B. v. A. S. Abell Co., 4 Cir., 97 F.2d 951; Solvay Process Co. v. N. L. R. B., 5 Cir., 117 F.2d 83.

[4] N. L. R. B. v. Texas Mining & Smelting Co., 5 Cir., 117 F.2d 86; N. L. R. B. v. Southport Petroleum Co., 5 Cir., 117 F.2d 90.

[5] Solvay Process Co. v. N. L. R. B., supra; N. L. R. B. v. Texas Mining & Smelting Co., supra.

686

side organization over an affiliated union was twice clearly stated in its own publication;[6] and some of those most active in the formation of the "Committee" were supervisory employees.[7]

There is nothing in respondent's conduct which justifies the blanket injunction of paragraph 1(c) of the order;[8] and the Board is without authority to require the employer to repay sums received by improperly discharged employees from governmental agencies.[9] Nor do the violations of the act found to exist in this case justify an order requiring the posting of declarations of future good intentions and compliance by those branches not found to be at fault.[10]

A decree will be entered directing that the order of the National Labor Relations Board be modified in accordance with this opinion, and, as modified, enforced.

---

[6] N. L. R. B. v. Texas Mining & Smelting Co., supra.

[7] International Association of Machinists v. N. L. R. B., supra; H. J. Heinz Co. v. N. L. R. B., 61 S.Ct. 320, 85 L. Ed. ——; Solvay Process Co. v. N. L. R. B., supra.

[8] N. L. R. B. v. Express Pub. Co., March 3, 1941, 61 S.Ct. 693, 85 L.Ed. ——.

[9] Republic Steel Corp. v. N. L. R. B., 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. ——.

[10] N. L. R. B. v. Ford Motor Co., 5 Cir., April 23, 1941, 119 F.2d 326.