INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, et al., Appellants,

v.

William BROCK, Secretary of Labor, et al.

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, et al., Appellants,

v.

William BROCK, Secretary of Labor, et al.

Nos. 84–5051, 84–5864.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 16, 1985.

Decided Feb. 11, 1986.

Randy S. Rabinowitz and Laurence E. Gold, Washington, D.C., of the Bar of District of Columbia, pro hac vice, by special leave of the Court, with whom Jordan Rossen, Leonard Page, Stephen I. Schlossberg, Detroit, Mich., and Jules Bernstein, Washington, D.C., were on brief, for appellants. Abraham L. Zwerdling, Washington, D.C., also entered an appearance for appellants.

John C. Hoyle, Atty., Dept. of Justice, with whom Richard K. Willard, Acting Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty., and Robert S. Greenspan, Atty., Dept. of Justice, Washington, D.C., were on brief, for appellees.

Before WALD, GINSBURG and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This case involves the application of a provision of the Administrative Procedure Act foreclosing judicial review when "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2), to a decision by the Department of Labor ("DOL") not to take enforcement action requested by one of the plaintiffs, and to the substantive interpretations of law announced in the course of that decision. The International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, UAW ("Union" or "UAW"), The Center to Protect Workers' Rights, and the Workers' Defense League appeal from the district court's order in which the court dismissed the suit and held that section 701 precluded review of both aspects of the agency's action. We hold that the DOL's ultimate decision not to take enforcement action is nonreviewable under the principles of *Heckler v. Chaney,* —— U.S. ——, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), but that its pronouncement of new statutory interpretations in an opinion explaining the nonenforcement decision is reviewable because standing, finality, and ripeness requirements have been satisfied, because the pronouncements have immediate consequences on those subject to the statute, and because the agency action in question cannot be reviewed at a later date. Accordingly, we remand to the district court to consider plaintiffs' claim that the challenged statutory interpretations are arbitrary, capricious, or otherwise contrary to law.

## I. BACKGROUND

### A. The Labor-Management Reporting Disclosure Act of 1959

During the late 1950s, the Senate Select Committee on Improper Activities in the Labor or Management Field (the "McClellan Committee") held extensive hearings on corrupt and unethical practices by unions, employers, and labor relations consultants. *See Interim Report of the Select Committee on Improper Activities in the Labor or Management Field,* S.Rep. No. 1417, 85th Cong., 2d Sess. (1958). As a result of these hearings, Congress enacted the Labor-Management Reporting Disclosure Act of 1959 ("LMRDA"), in order to "afford necessary protection of the rights of employees and the public generally as they relate to the activities of labor organizations, employers, labor relations consultants, and their officers and representatives." 29 U.S.C. § 401(b).

The LMRDA has seven titles dealing with various facets of internal union affairs and labor-management relations. Ti-

tle II of the Act requires that unions, employers, consultants, and other persons report certain kinds of activities involving union-labor relations. The Act "requires far more extensive reporting and disclosure requirements of unions and their officers than it does of employers and consultants." *Donovan v. Master Printers Association,* 532 F.Supp. 1140, 1142 n. 2 (N.D.Ill.1981), *aff'd,* 699 F.2d 370 (7th Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). For purposes of this case, however, we need only focus on section 203 of the Act, 29 U.S.C. § 433, which deals with the reporting requirements of employers and consultants. Congress imposed these requirements on the premise that certain conduct, even if legal, "should be exposed to public view, for if the public has an interest in preserving the rights of employees then it has a concomitant obligation to insure the free exercise of them." S.Rep. No. 187, 86th Cong., 1st Sess. 11, *reprinted in* 1 National Labor Relations Board, *Legislative History of the Labor-Management Reporting and Disclosure Act of 1959* at 407 (1959), U.S.Code Cong. & Admin.News 1959, 2318, 2327. The contents of filed reports are public information available for public examination. *See* 29 U.S.C. § 435; 29 C.F.R. § 405.10, 406.9 (1985).

The Act requires that employers file annual reports on a variety of activities involving their relationship with unions, including:

> (3) any expenditure, during the fiscal year, where an object thereof, directly or indirectly, is to interfere with, restrain, or coerce employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing, or is to obtain information concerning the activities of employees or a labor organization in connection with a labor dispute involving such employer, except for use solely in conjunction with an administrative or arbitral proceeding or a criminal or civil judicial proceeding;
>
> (4) any agreement or arrangement with a labor relations consultant or other independent contractor or organization pursuant to which such person undertakes activities where an object thereof, directly or indirectly, is to persuade employees to exercise or not to exercise, or persuade employees as to the manner of exercising, the right to organize and bargain collectively through representatives of their own choosing, or undertakes to supply such employer with information concerning the activities of employees or a labor organization in connection with a labor dispute involving such employer, except information for use solely in conjunction with an administrative or arbitral proceeding or a criminal or civil judicial proceeding; or
>
> (5) any payment (including reimbursed expenses) pursuant to an agreement or arrangement described in subdivision (4);
>
> . . .

29 U.S.C. § 433(a).

The Act also requires reports from "persuaders":

> Every person who pursuant to any agreement or arrangement with an employer undertakes activities where an object thereof is, directly or indirectly—
>
> (1) to persuade employees to exercise or not to exercise, or persuade employees as to the manner of exercising, the right to organize and bargain collectively through representatives of their own choosing; or
>
> (2) to supply an employer with information concerning the activities of employees or a labor organization in connection with a labor dispute involving such employer, except information for use solely in conjunction with an administrative or arbitral proceeding or a criminal or civil judicial proceeding;
>
> . . .

29 U.S.C. § 433(b).

The section, however, specifically excepts some activities that might otherwise fall within these reporting requirements. Relevantly, it provides that:

> Nothing in this section shall be construed to require any employer or other person to file a report covering the ser-

sssssssssssssssssssssssssssssssssssssssssssssssssssssssssssssssssssssssssssssss

---

**241**

vices of such person by reason of his giving or agreeing to give advice to such employer or representing or agreeing to represent such employer before any court, administrative agency, or tribunal of arbitration or engaging or agreeing to engage in collective bargaining on behalf of such employer with respect to wages, hours, or other terms of conditions of employment or the negotiation of an agreement or any question arising thereunder.

29 U.S.C. § 433(c).

Enforcement of the Act rests exclusively in the hands of the Secretary of Labor. He has the authority to institute civil, 29 U.S.C. § 440,[1] or criminal actions, 29 U.S.C. § 439,[2] against violators. No private cause of action exists to enforce the statute's provisions. *See International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. National Right to Work Legal Defense and Education Foundation, Inc.*, 590 F.2d 1139 (D.C.Cir.1978).

### B. *Factual Background of This Case*

In March, 1983, the UAW filed an administrative complaint with the Secretary alleging that Kawasaki Motor Corporation ("Kawasaki") and its attorney-consultants Tate & Sykes (the "Tate Firm"), had engaged in conduct at Kawasaki's Lincoln, Nebraska plant which should have been reported under sections 203(a) and (b) of the LMRDA. These allegedly reportable activities involved Kawasaki's attempts to thwart the UAW's organizing drive, attempts which had already been the subject of the National Labor Relations Board's ("NLRB") unfair labor practice proceedings and sanctions. *Kawasaki Motor Corporation and International Union, United Automobile, Aerospace, and Agri-*

*cultural Implement Workers of America, AFL–CIO (UAW)*, 257 N.L.R.B. 502 (1981), *order enforced*, 691 F.2d 507 (9th Cir.1982), *cert. denied*, 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983).

On March 29, 1982, the Director of the Labor Management Services Administration ("LMSA") responded to the UAW's complaint by disclosing that investigations into the matter had already been conducted, and that "[a]fter carefully reviewing the investigative findings, we have determined that *reports were not required*." Joint Appendix ("J.A.") at 104 (emphasis added). Subsequently, the UAW learned through a request under the Freedom of Information Act, 5 U.S.C. § 552, that the LMSA field staff investigation had indeed found that Kawasaki engaged in seven instances of reportable conduct, and that Kawasaki had specifically refused the Department's request that it file the required reports. Armed with this new information, the UAW asked the Director on April 19, 1982, to reconsider his March 29 decision that reports were not required. J.A. at 105. On April 26, 1982, the Director refused to do so, stating this time that "[t]he evidence disclosed during the course of our investigation was not substantial enough to warrant further action," and that any further evidence in support of reopening should be referred to the Kansas City Area Office of the LMSA. J.A. at 106.

Faced with this shifting rationale for why the Department refused to take action, the UAW filed a formal petition with the Secretary of Labor on June 16, 1982, again requesting that he take enforcement action on the Kawasaki matter, and further, that he respond to the request within 21 days. In the absence of a response, the UAW filed a complaint on September 8,

---

1. 29 U.S.C. § 440 states:
 Whenever it shall appear that any person has violated or is about to violate any of the provisions of this subchapter, the Secretary may bring a civil action for such relief (including injunctions) as may be appropriate. Any such action may be brought in the district court of the United States where the violation occurred or, at the option of the

parties, in the United States District Court for the District of Columbia.

2. 29 U.S.C. § 439(a) states:
 Any person who willfully violates this subchapter shall be fined not more than $10,000 or imprisoned for not more than one year, or both.

1982, in the United States District Court for the District of Columbia. Plaintiffs' amended complaint contained three counts: First, they sought a declaration that the Department's determination that reports were not required from Kawasaki was arbitrary, capricious, and contrary to law, and an order compelling the Department to enforce the Act against Kawasaki. Amended Complaint ¶¶ 1, 26–30, *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, UAW v. Donovan*, 577 F.Supp. 398 (D.D.C.1983). Second, they sought a declaration that the Secretary's determination that reports were not required from the Tate firm was arbitrary, capricious, and contrary to law, and that the Department's failure to require reports from the Tate firm was part of a continuing pattern and practice of failing to enforce the Act against these specific consultant-attorneys. *Id.* at ¶¶ 2, 31–39. Finally, they sought a declaration that the Department had completely abrogated its responsibilities to enforce the Act's provisions against employers and their hired consultants, and an order compelling the Department to enforce those provisions in the future. *Id.* at ¶¶ 3, 40–43.

## C. *The Department's Statement of Reasons*

Although the Department had not previously submitted any detailed statement of reasons for its inaction to the UAW, such a statement was now included as an addendum to its motion for dismissal, or in the alternative, summary judgment. In its motion the DOL argued (a) that the Workers' Defense League and Center to Protect Workers' Rights lacked standing altogether to bring the action, and that the UAW lacked standing with respect to counts two and three of the amended complaint dealing with the Tate Firm's reporting and the DOL's general pattern of practice, (b) that the Department's enforcement authority is committed to agency discretion by law, and thus, not subject to judicial review, and (c) that its decision as set out in its Statement of Reasons [3] was not arbitrary, capricious, or contrary to law.

In its Statement of Reasons, the Department explained that the Secretary's decision not to take enforcement action was based on a combination of factors including: findings that many of the UAW's allegations were not substantiated; [4] determinations that some of the activities were not reportable under established current law; [5] a decision that the pursuit of these actions would not be the best expenditure of the agency's resources since the NLRB had already publicized the challenged activities through their unfair labor practice proceeding; an assessment that some of the requested enforcement action would be impracticable; [6] *and an announcement that the Secretary was now interpreting the*

---

3. Although the Statement of Reasons was submitted as an addendum to litigation documents, the Department asserts that it is in fact the statement that it had prepared to send to the UAW to explain its decision not to take action, *see* Appellees' Brief at 9. Moreover, DOL has continuously maintained that this statement of reasons represents the agency decision under review. *See* Defendants' Motion to Dismiss Or, in the Alternative, for Summary Judgment at 42–45, *International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, UAW v. Donovan*, 577 F.Supp. 398 (D.D.C.1983). The district court treated it as the critical document under review, 577 F.Supp. at 405 n. 14, and we will do likewise.

4. The Department explained that its investigation did not substantiate the Union's allegations that the "consultant aided in setting up an anti-

union organization; aided an anti-union campaign behind the scenes; prepared letters and speeches delivered to employees; spied on employees through use of paid informants and assisted in the preparation of a bomb threat notice." J.A. at 60.

5. For example, the Union had alleged that the consultant had provided the employer with information about the UAW. The Statement of Reasons explained that "[T]he Department of Labor ... had previously determined that the gathering of materials publicly available does not require reporting." J.A. at 61.

6. The Secretary stated, for example, that "analysis of the different complaints made to the Secretary show that the application of the split-income theory is neither workable nor practicable."

*statute as no longer requiring reporting of two of the activities involved in the case.*

First, with respect to the Union's allegation that Kawasaki and the Tate Firm had failed to report the Tate Firm's activities to persuade supervisors in the Kawasaki plant to work against unionization, the Secretary held that it was now interpreting such activity to come within the advice exception of 29 U.S.C. § 433(c). He stated that:

> An activity is characterized as advice if it is submitted orally or in written form to the employer for his use, and the employer is free to accept or reject the oral or written material submitted to him.... Thus, with respect to the consultant, although the law firm advised the employer (*including supervisors*) regarding anti-union activities during the UAW organizing campaigns, *these activities did not constitute persuader activities under the Act, and do not require reports by the consultant.*

J.A. at 61 (emphasis added).

Second, the Secretary addressed the Union's allegations that Kawasaki failed to report that it paid supervisors to discourage unionization. The Secretary first conceded that:

> Early in the administration of the Act it had been considered that a prorated share of regular salaries and wages paid to supervisors or other employees who engaged in conduct referred to in sections 203(a)(2) and (3) of the Act, 29 U.S.C. § 433(a)(2) and (3), might be reportable by the employer. This was known as the "split income theory."

J.A. at 63. He then went on, however, to announce a new interpretation of the statute:

> In recent years, a large number of complaints were filed with the Secretary on

this theory, and an examination of the many different fact situations presented by these complaints caused the Department of Labor to re-examine the split income theory and its relationship to section 203(e) of the Act. Reviewing legislative history, it was found that "[u]nder section 203(e) ... none of the reporting requirements are applicable when the services are rendered by a regular officer, supervisor, or employee of the employer." (Barry Goldwater, Analysis of the Labor-Management Reporting and Disclosure Act of 1959, Cong.Rec. 19749–62, Oct. 2, 1959). Given the ambiguity of the language of section 203(e) together with the purpose of the Act to expose hidden amounts of money spent by the employer in his attempts to convince his employees not to unionize, and given that wage payments are known facts, *it is the Department's view that employers are not required to report regular wages paid to regular supervisors and other employees.*

*Id.* (emphasis added).

### D. *The District Court's Decisions*

Although the district court rejected the Department's argument that the Union had no standing, it granted the Department's motion to dismiss on the ground that enforcement authority of the Secretary under the LMRDA is "so broad that there is no law to apply." 577 F.Supp. at 405. The district court, thus, had no occasion to pass on the plaintiffs' allegations that the Secretary's action was "arbitrary, capricious, or otherwise contrary to law," allegations which the plaintiffs had pressed with special vigor after receiving the Statement of Reasons for the decision.[7]

Five months after the district court entered its order dismissing the suits, plain-

---

**7.** In its opposition to defendants' motion for dismissal, plaintiffs repeatedly stressed that even if they were not entitled to review of the Department's ultimate decision to take no action, they were entitled to review of the revised legal standards governing employers' and consultants' reporting obligations announced in the Statement of Reasons. *See* Memorandum of

Points & Authorities in Opposition to Defendants' Motion to Dismiss and in Support of Plaintiffs' Request for discovery Pursuant to Rule 56(f), Federal Rules of Civil Procedure at 5 n. 4, 23 n. 14, *International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, UAW v. Donovan,* 577 F.Supp. 398 (D.D.C.1983).

tiffs brought a motion for reconsideration under Fed.R.Civ.P. §§ 60(b)(2) and 60(b)(3), alleging that in the course of hearings held in early February, 1984, before the U.S. House of Representatives Subcommittee on Labor-Management Relations of the Committee on Education and Labor, "new evidence" was disclosed. This "new evidence" consisted mainly of LMSA Notice 13–82, an internal memorandum instructing all field officers that "[c]ases and/or allegations involving 'split-income' theories and so-called 'indirect contact' theories concerning consultants (alleged contacts by consultants with employees through supervisors) should be closed." J.A. at 145. The memorandum explained that "[w]ith our limited resources, and the large number of open employer/consultant cases on hand we must give priority to those cases and/or allegations involving issues with legal precedent." *Id.* Plaintiffs argued that this memorandum, dated March 12, 1982, and premised purely on discretionary considerations, constituted a legislative rule adopted without proper rulemaking procedures. Moreover, the Union argued that the notice belied the Department's claim in its Statement of Reasons that its decision was based on a new examination of the legislative history, evinced a wholesale abrogation of the Secretary's responsibilities to enforce the Act against employers and consultants, and was otherwise arbitrary, capricious, and contrary to law. *See* Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Reconsideration at 5–7.

The district court denied plaintiff's motion to reopen, opining that "in the end the difficulty that faced plaintiffs previously still precludes their securing relief—that of prosecutorial discretion." *Order, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW v. Donovan*, Civ. No. 82–2515 (Nov. 28, 1984), *reprinted in* J.A. at 14. Plaintiffs filed timely notices of appeal, first from the decision granting defendants' motion for summary judgment, and later from the denial of reconsideration.

## II. REVIEWABILITY

### A. *The Decision Not to Take Enforcement Action*

■ To the extent that the Union continues to challenge[8] the Department's decision not to pursue enforcement action against those who engage in the two activities at issue here, the Supreme Court's ruling in *Heckler v. Chaney*, —— U.S. ——, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), clearly controls. In *Chaney*, the Court established a rebuttable presumption that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion" under 5 U.S.C. § 701(a)(2). *Id.* at 1656.

As in *Chaney*, there is nothing in the statute, regulations, or any other source of guidance in this case that rebuts the presumption that the agency's decision not to pursue enforcement action against given classes of activity is nonreviewable. For example, the relevant statutory provision here, as in *Chaney*, does not mandate that the Department take enforcement action against each and every violation. *Compare* 29 U.S.C. § 440 ("Secretary may

---

8. The exact nature of the plaintiffs' challenge to the agency's nonenforcement decision and pattern of practice has been made uncertain by its withdrawal of part of its challenge to conform with the dictates of *Heckler v. Chaney. See* Appellants' Reply Brief at 1–2. It now seems that the plaintiffs have withdrawn their challenge of the nonenforcement decision vis-a-vis Kawasaki and the Tate Firm, but continue to challenge the overall pattern of nonenforcement. *Id.* In addition, they clearly continue to challenge the propriety of the "Secretary's determination that split-income payments and indirect persuader activity are outside the ambit of Title II's reporting obligation." *Id.* at 2.

Unlike *Chaney*, therefore, the plaintiffs' challenge in this case is not limited to a request that the agency take enforcement action. This challenge is directed at the independent impact of the agency's statutory interpretations on those subject to the reporting requirements, and thus affects far more than just the agency's own enforcement decisions. *See infra* 248–49 & n. 15.

bring a civil action ... as may be appropriate") *with* 29 U.S.C. § 482(b) ("Secretary shall investigate"). Nor does the statute or any other source provide any guidelines mandating that the Department give enforcement priority to any specific type of violation.[9] Moreover, the plaintiffs' allegations are insufficient to establish that the "agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." *Chaney,* 105 S.Ct. at 1649 (quoting *Adams v. Richardson,* 480 F.2d 1159, 1162 (D.C.Cir.1973) (en banc)). Thus, we conclude, as the district court did, that there is no review available from the agency's specific nonenforcement decision in the Kawasaki matter, or its overall pattern of decisions not to pursue enforcement action in these areas.

B. *The Department's Interpretation of Its Statute*

If the Union had challenged only the Department's decision not to take enforcement action against Kawasaki and the Tate firm, or even against this entire genus of practices, our task would be completed. The Union has, however, consistently challenged the Department's legal determinations made in its Statement of Reasons that *no reports were required* for indirect persuasion of employees through supervisors, and for payments to supervisors to discourage unionization. Nothing in the Administrative Procedure Act or in the holding or policy of *Heckler v. Chaney,* precludes review of a proper plaintiff's timely challenge of an agency's announcement of its interpretation of a statute.

*Chaney* reasoned that courts are inherently unsuited for the task of reviewing an agency's decision on where and when to pursue enforcement action. First, the Court pointed out that given an agency's inability to take enforcement action against each and every violation, the decision on where to expend its enforcement resources was inherently part of the agency's discretionary authority. *Chaney,* 105 S.Ct. at 1656. Second, the Court pointed out that non-enforcement decisions usually do not involve the exercise of "coercive power over individuals' liberty or property rights, and thus d[o] not infringe upon areas that courts are called upon to correct." *Id.* (emphasis deleted). Third, the Court pointed out that when an agency decides not to act there is often no focus for judicial review. *Id.* Finally, the Court pointed out the similarities between an agency's decision not to take enforcement action and a prosecutor's traditionally nonreviewable exercise of prosecutorial discretion. *Id.* Given all of these factors, *Chaney* reaffirmed the " 'recognized position that § 701(a)(2) applies in certain circumstances where courts are unqualified to decide whether an agency has abused its discretion.' " *Robbins v. Reagan,* 780 F.2d 37, 45 (D.C.Cir. 1985) (quoting *Cardoza v. Commodity Futures Trading Comm'n,* 768 F.2d 1542, 1549 (7th Cir.1985)).

By contrast, when a legal challenge focuses on an announcement of a substantive statutory interpretation, courts are emphatically qualified to decide whether an agency has acted outside of the bounds of reason.[10] *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 2782 n. 9, 81 L.Ed.2d 694 (1984) ("The judiciary is the final authority on issues of statutory construction"); *Amalgamated Transit Union International, AFL–CIO v. Donovan,* 767

---

**9.** This case does not present "a refusal by the agency to institute proceedings based solely on the belief that it lacks jurisdiction," which, the Supreme Court indicated might not come under the *Chaney* presumption because "the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion.' " *Id.* at 1657 n. 4. The Department's decision not to take enforcement action relative to the two areas of activity in this

case was predicated on a combination of both statutory and discretionary grounds.

**10.** Indeed, *Chaney* itself left open the possibility that review might be available even for a nonenforcement decision if that decision is predicated solely on the agency's interpretation of a statute. 105 S.Ct. at 1656 n. 4. The rationale for this exception is clear: the court has law to apply in determining whether the agency erred.

F.2d 939, 944 n. 7 (D.C.Cir.1985) (contrasting nonreviewable discretionary authority with reviewable agency determination of its statutory authority). Even if a statutory interpretation is announced in the course of a nonenforcement decision, that does not mean that it escapes review altogether. *Cf. International Union of Bricklayers v. Meese*, 761 F.2d 798, 801 (D.C.Cir.1985) (appellant could challenge underlying legal standard governing INS operations even though it could not challenge individual determinations on whether aliens should be admitted). Indeed, it seems almost ludicrous to suggest that there is "no *law* to apply" in reviewing whether an agency has reasonably interpreted a *law*.

This court's recent decision in *Schering Corp. v. Heckler*, 779 F.2d 683 (D.C.Cir. 1985), is not to the contrary. In *Schering*, the court held that *Chaney* precluded review of an agency's agreement not to take enforcement action against a manufacturer of an animal drug. The court stressed that the agreement "merely embodie[d] a legitimate exercise of enforcement discretion," at 687, and could not be characterized as a decision affecting the underlying legal or factual issues. *Id.* at 685. Here, by contrast, plaintiffs challenge the interpretation of the statute precisely because of the immediate and certain effect that it has on employers' and consultants' reporting duties. There are real and cognizable practical differences distinguishing an agency's announcement of how it will exercise its discretion, from an agency's announcement of what a citizen's duties are under a statute like the LMRDA that depends primarily

upon self-enforcement. *See infra* at 247, 248–49 & n. 15.

■ Were we to accept the Department's contention, we would be handing agencies carte blanche to avoid review by announcing new interpretations of statutes only in the context of decisions not to take enforcement action. Of course, agencies have wide leeway in choosing to announce rules and interpretations in the course of adjudications. *See SEC v. Chenery*, 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947); *infra* at 248. But our approval of the authority to interpret and implement statutory authority through adjudications has always contemplated the availability of judicial review to ensure that the announced interpretations are consistent with the governing statute. Nothing in *Heckler v. Chaney* changed any of this.

### III. JUSTICIABILITY ISSUES

That *Chaney* does not foreclose review of an agency's statutory interpretation announced in the course of a nonenforcement decision does not, of course, mean that such review is always available. We must still determine (a) whether the plaintiff has standing to bring the challenge to the interpretation; (b) whether the interpretation qualifies as final agency action; and (c) whether the challenge of the announced interpretation is ripe for judicial review.[11]

### A. *Standing*

■ As the district court held, the Union clearly has standing to challenge the Department's announcement of its statutory interpretation relating to the "advice" and "split-income" issues. The Union [12]

---

**11.** We have addressed the *Chaney* question before the traditional justiciability questions only because, in this case, the outcome of the *Chaney* analysis is critical to our disposition of some of these other issues—particularly the hardship element of the ripeness test. *See infra* 249–251. We do not anticipate that the *Chaney* inquiry will generally be addressed prior to the constitutional and prudential aspects of justiciability.

**12.** Since the district court held that the Union had standing to bring its challenge, it declined to decide whether the other plaintiffs did as

well. 577 F.Supp. at 403 n. 7. As we agree with the district court's determination about the Union's standing, we too decline to address that issue. *See Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981) (finding that one plaintiff had standing and refraining from considering whether others also did); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 562 n. 9, 50 L.Ed.2d 450 (1977) (same).

has alleged adequate facts to satisfy the tests enunciated in *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982), where the Supreme Court explained that the constitutional components of standing require that a plaintiff tenably allege that: (a) he suffered personal injury, (b) the injury is fairly traceable to defendant's challenged conduct, and (c) his injury is likely to be redressed by the relief sought. *See also Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984).

The Union asserts that the announced interpretation has the effect of depriving it and its members of information to which the LMRDA entitles it about employer activities involving payments for indirect persuasion and payments made to supervisors for work in opposition to labor organizations. Moreover, the Union alleges that the Department's misinterpretation of the statute in these two respects removes the deterrent effect on employers and consultants that the reporting requirements create, and thus directly interferes with the Union's and its members' ability to organize workers. These allegations satisfy the "injury" component of the standing doctrine. *See Association of Data Processing Serv. Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (competitive injury gives standing); *International Ladies' Garment Workers' Union v. Donovan ("IGLWU"),* 722 F.2d 795, 805–12 (D.C.Cir.1983) (union has standing to challenge action that opens door to increased competition), *cert. denied,* —— U.S. ——, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984); *see also Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977) (describing association's standing to bring suit on behalf of members).

Plaintiffs' allegations also satisfy the causation element of the standing doctrine, since the interpretation at issue has the effect of legalizing [13] employers' and consultants' nonreporting of activities falling into the two contested categories. *See Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 151–52, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970) (standing where complaint is of injurious competition that would have been illegal but for the challenged governmental action); *ILGWU,* 722 F.2d at 810–11 (labor organizations had standing to challenge agency decision which rescind restrictions on employment of workers in the home).

Finally, plaintiffs satisfy the redressability requirement. Should the agency be required to modify its interpretation, employers will be under a legal duty to report the transactions which, under the interpretation challenged here, currently need not be reported. Moreover, a law-abiding [14] employer considering the practices at issue will be put to the choice of either reporting them or refraining from engaging in them in the first place, with the expected result that many will refrain. A decision in the Union's favor would thus clearly go a long way toward redressing the Union's injury. *See ILGWU,* 722 F.2d at 811–12 ("as Congress passed the Act partly to provide redress to employers from unfair competition, the suggestion that effective enforcement of the Act will not have this effect directly contravenes congressional judgment underlying the Act").

## B. *Final Agency Action*

 The Administrative Procedure Act provides for judicial review of final agency action, and defines "agency action" as including a "rule." 5 U.S.C. § 704. That term, in turn, is defined as "an agency statement of general or particular applicability and future effect designed to imple-

---

**13.** *See infra* at 248–249 and n. 15.

**14.** The Supreme Court has instructed that in assessing matters of standing, courts are to assume that individuals abide by the law. *See*

*City of Los Angeles v. Lyons,* 461 U.S. 95, 102–03, 103 S.Ct. 1660, 1665–66, 75 L.Ed.2d 675 (1983); *O'Shea v. Littleton,* 414 U.S. 488, 497, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974).

ment, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). "The term 'agency action' thus embraces an agency's interpretation of its law, and it is the finality of that action that we must consider." *National Automatic Laundry and Cleaning Council v. Shultz*, 443 F.2d 689, 698 (D.C.Cir. 1971).

The Supreme Court has explained that "the relevant considerations in determining finality are whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether *rights or obligations* have been determined or *legal consequences* will flow from the agency action." *Port of Boston Marine Terminal Assoc. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970) (emphasis added). The inquiry is a "flexible" one which necessarily takes account of "pragmatic considerations." *See FTC v. Standard Oil of California*, 449 U.S. 232, 240, 101 S.Ct. 488, 493, 66 L.Ed.2d 416 (1980).

In evaluating whether this announcement represents final agency action it is essential to recognize that many agencies choose to adopt interpretations through adjudications rather than through rulemaking, and that this process has been widely approved by the courts. *See SEC v. Chenery*, 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947); *Wisconsin Gas Co. v. FERC*, 770 F.2d 1144, 1166 (D.C.Cir.1985). When an agency uses an adjudication as a vehicle for announcement of a new rule, therefore, the effect of the adjudication can go far beyond its immediate effect on the parties involved in the specific adjudication. In this case, for example, employers will justifiably rely on the Department's interpretation and, therefore, not report the transactions at issue. *Cf. Cox v. Louisiana*, 379 U.S. 559, 568–69, 85 S.Ct. 476, 482–83, 13 L.Ed.2d 487 (1965) (citizens "justifiably tend to rely on admin-

istrative interpretations"). In short, "[an] administrative agency has available two methods for formulating policy that will have the force of law. An agency may establish binding policy through rulemaking procedures by which it promulgates substantive rules, or through adjudications which constitute binding precedent." *Pacific Gas & Electric Co. v. Federal Power Comm.*, 506 F.2d 33, 38 (D.C.Cir.1974) (footnote omitted). This court has "frequently held that an agency's interpretation of its governing statute, with the expectation that regulated parties will conform to and rely on this interpretation, is final agency action fit for judicial review." *Independent Bankers Ass'n of America v. Smith*, 534 F.2d 921, 929 & n. 27 (D.C.Cir.), *cert. denied*, 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 141 (1976). *See also Potomac Electric Power Co. v. ICC*, 702 F.2d 1026, 1030 (D.C.Cir.1983) (one of criteria in evaluating finality is whether agency action has force of law).

The Department may, of course, reverse its interpretation at some future date, but that does not change the reality that the current interpretation could quite likely be used as a defense to any criminal action against an employer for activity that was permitted while the interpretation was in force. *See* American Law Institute, *Model Penal Code* § 2.04(3)(b) (1985) ("individual has defense when he acts in reasonable reliance upon an official statement of the law, afterward determined to be invalid or erroneous, contained in … an official interpretation of the public officer or body charged by law with responsibility for the interpretation, administration or enforcement of the law defining the offense"), and cases cited therein. In the civil context as well, there are cases supporting the proposition that an agency may not impose liability retroactively when the individual has acted in accordance with the agency's own announced interpretation of the statute.[15]

---

**15.** By contrast, an agency may freely change its policy on how it will exercise its enforcement discretion, and even good faith reliance on an announcement that an agency does not intend

to prosecute a specific violation is no defense in a subsequent prosecution. *See Sullivan v. United States*, 348 U.S. 170, 173–74, 75 S.Ct. 182, 184–85, 99 L.Ed. 210 (1954) (defendant cannot

*See Retail Wholesale and Department Store Union v. NLRB,* 466 F.2d 380 (D.C. Cir.1972); *McDonald v. Watt,* 653 F.2d 1035 (5th Cir.1981); *NLRB v. Majestic Weaving Co.,* 355 F.2d 854 (2d Cir.1966).

Unless the agency indicates otherwise, courts are entitled to presume that a statutory interpretation announced in an adjudication represents the agency's [16] "final" position on the issue—to the extent that any agency position is ever final. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) (fact that no further administrative proceedings were contemplated adds to conclusion of finality); *Better Government Association v. Department of State,* 780 F.2d 86, 92–93 (1986) (agency guideline was "final" when agency indicated no intention to subject it to public notice and comment and agency expected guideline to govern); *Eagle-Picher Industries v. United States E.P.A.,* 759 F.2d 905, 917 (D.C.Cir.1985) (absence of equivocal or tentative language indicates that decision constitutes agency's "final position"). Of course, in more typical cases, announcements of general policies may not be ripe for judicial review until they are actually applied against specific plaintiffs. *See, e.g., Alascom, Inc. v. FCC,* 727 F.2d 1212 (D.C.Cir.1984); *Balti-*

*more Gas & Electric Co. v. ICC,* 672 F.2d 146 (D.C.Cir.1982). There are, however, exceptions to this principle, to which we now turn.

### C. *Ripeness*

■ In deciding whether an agency's action is ripe for judicial review a court must " 'balance its interest in deciding the issue in a more concrete setting against the hardship to the parties caused by delaying review.' " *Atlantic Richfield Co. v. United States Dep't of Energy ("ARCO"),* 769 F.2d 771, 783 (D.C.Cir.1984) (quoting *Webb v. Dep't of Health & Human Servs.,* 696 F.2d 101, 106 (D.C.Cir.1982)). In this case, we determine that, given the purely legal nature of the issues and the unavailability of any future opportunity for review, both the court's and the parties' interests are best served through review at this stage.

#### 1. *Fitness of the Issues for Judicial Decision*

An issue is "fit for judicial resolution" under the ripeness test, if it is (a) essentially legal, and (b) "sufficiently final." *See ARCO,* 769 F.2d at 783; *Gulf Oil Corp. v. United States Dep't of Energy,* 663 F.2d 296, 310 (D.C.Cir.1981). Since we have al-

---

challenge District Attorney's action in prosecuting even if it violated agency's "housekeeping provisions"); *United States v. Fitch Oil Co.,* 676 F.2d 673, 677–78 (T.E.Ct.App.1982) (internal rules not binding on agency); *United States v. Hayes,* 589 F.2d 811, 818 (5th Cir.) (agency not bound by press release indicating how it will exercise discretion), *cert. denied,* 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979); *see generally* K. Davis, *Administrative Law Treatise* § 9:10 (1979) (discussing legal effect of nonenforcement instructions); Note, *Violations by Agencies of Their Own Regulations,* 87 Harv.L.Rev. 629 (1974).

The difference between an agency's interpretation of law and an agency's announcement of how it will exercise its discretion can be gleaned by comparing, for example, a prosecutor's statement that his office will *no longer prosecute* possession of *de minimis* amounts of marijuana, with a prosecutor's statement that he interprets the state's statute as *permitting* possession of small amounts of marijuana.

**16.** Unlike the advice of the special counsel in *American Federation of Government Employees, AFL–CIO v. O'Connor,* 747 F.2d 748 (1984), *cert.*

*denied, —— U.S. ——,* 106 S.Ct. 279, 88 L.Ed.2d 243 (1985), the interpretation announced by the Department represents an authoritative statement by the responsible agency on what the law is. In *O'Connor,* this court held that the special counsel to the Merit Systems Protection Board ("MSPB") had no authority to represent the agency's position, and that his statement was merely "a forecast, albeit an educated one, of the way the MSPB would rule if an actual case materialized." *Id.* at 753–54. The court stressed, however, that "[w]hen Congress positions an agency to speak the final administrative word on the meaning of a statute, and that agency talks, judicial review of the pronouncement may well be in order." *Id.* at 753 (citing *Joseph v. United States Civil Service Commission,* 554 F.2d 1140 (D.C.Cir.1977); *Continental Air Lines v. Civil Aeronautics Board,* 522 F.2d 107 (D.C.Cir.1974) (en banc); *National Automatic Laundry & Cleaning Council v. Shultz,* 443 F.2d 689 (D.C.Cir.1971); *National Student Association v. Hershey,* 412 F.2d 1103 (D.C.Cir. 1969)).

ready determined that the challenged interpretation qualifies as sufficiently "final," *see supra* Part III.B., we need only concern ourselves with whether our review of the issue would substantially benefit from being deferred until some later date.

The issues presented by the underlying case are purely legal, and would not become any more concrete from further factual development. The Department has made a broad pronouncement on the "indirect persuasion" and "split-income" issues that goes far beyond the facts of any given case. The sole issue presented is whether these new interpretations are inconsistent with the statute which they interpret. Under these circumstances, the first component of the ripeness inquiry is certainly satisfied. *See Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Development Comm.*, 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983); *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 81–82, 98 S.Ct. 2620, 2634–35, (1978); *Better Government Association*, at 92.

### 2. Hardship to the Parties

The second facet of the ripeness inquiry requires that we examine the hardship that the plaintiff will incur if review is delayed. Often a plaintiff alleges economic hardship, claiming that the agency action requires that he expend considerable resources to stave off the threat of criminal prosecution. In such cases, the courts have held that the plaintiff's hardship is a strong element to be considered in determining whether a court should review the agency action before it is directly applied to the plaintiff. *See, e.g., Abbott Labs. v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

The hardship involved in this case is of a different sort, but just as compelling as that involved in cases like *Abbott Labs.* We start with the proposition that because of the effect that the agency action is bound to have on employers' and consultants' reporting of the types of transactions covered by the interpretations, the impact

of the challenged action can be said to "be felt immediately" by the Union in its day-to-day affairs, and that "irremediable adverse consequences" may flow from a determination that this case is not currently ripe for review. *Gardner v. Toilet Goods Ass'n*, 387 U.S. 158, 164, 87 S.Ct. 1520, 1525, 18 L.Ed.2d 697 (1967). That the interpretations do not directly compel plaintiffs to take immediate action does not mean that the plaintiffs do not suffer immediate hardship, sufficient to trigger review. *See Meltzer v. Board of Public Instruction*, 548 F.2d 559, 572–73 (5th Cir. 1977) (parents challenge of school regulation requiring teachers to "inculcate the practice of every Christian virtue" was ripe because of immediate, inevitable effect on teachers' behavior), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979); *see also Better Government Association*, at 93–95 (recognizing hardship where plaintiff alleged it was being deprived of statutory entitlement); *American Federation of Government Employees v. FLRA*, 750 F.2d 143, 144–45 (D.C.Cir.1984) (issuance of "interpretation and guidance" that authoritatively rejected union's statutory entitlement was ripe for immediate review since, by itself, it constituted a concrete injury).

The severity of the hardship is underscored by the realization that if the challenge is not ripe for review now, no review will ever be possible. The statutory interpretations on the "split-income" and "indirect persuasion" issues by their very nature will manifest themselves only in the form of repeated decisions not to take enforcement actions. Since each individual nonenforcement decision is unreviewable under the principle espoused in *Heckler v. Chaney*, —— U.S. ——, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), *see supra* 244–45, the option of *postponing* judicial review until the policy is applied against the particular individual is simply not available in this case. Our choice is between addressing the challenge in its current setting or permanently *withholding* judicial review of the agency's interpretation of the statute. Given the plaintiffs' strong interest in securing judicial review on the statutory in-

terpretations at issue, an interest which Congress clearly sought to protect by enacting the Administrative Procedure Act, we find that the hardship of permanently foreclosing review is clearly sufficient to make the challenge ripe.[17]

## IV. THE TWO INTERPRETATIONS AT ISSUE

■■■■■ Because the district court disposed of the case on the issue of nonreviewability, it had no opportunity to pass judgment on whether the particular statutory interpretations adopted by the Department are reasonable under the standards set out in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Undoubtedly because the appeal involved so many preliminary issues of justiciability and reviewability, the parties' briefs gave minimal attention to the substance of the challenged interpretations. In light of both factors, we think it both efficient and prudent to remand the substantive issues to the district court for an initial evaluation.

"It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *accord Youakim v. Miller,* 425 U.S. 231, 234, 96 S.Ct. 1399, 1401, 47 L.Ed.2d 701 (1976); *California v. Taylor,* 353 U.S. 553, 557 n. 2, 77 S.Ct. 1037, 1039 n. 2 1 L.Ed.2d 1034 (1957). "When the issues have, through no fault of the parties, not been briefed or argued adequately in any forum, the appropriate disposition is typically to remand the case to the district court." *Doe v. diGenova,* 779 F.2d 74, 89 (D.C.Cir.1985); *see generally Hormel v. Helvering,* 312 U.S. 552, 556, 61 S.Ct. 719, 85 L.Ed. 1037 (1941); *District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1084–85 (D.C.Cir.1984);

*British Airways Board v. Port Authority of New York,* 558 F.2d 75, 82 (D.C.Cir. 1977); *Doe v. McMillan,* 459 F.2d 1304, 1311 n. 10 (D.C.Cir.1972), *aff'd in part, rev'd in part,* 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); *Johnston v. Reily,* 160 F.2d 249, 250 (D.C.Cir.1947).

We recognize, of course, that this is not a case where further factual development is necessary to proceed, so we are not compelled to remand. Nonetheless, we are reluctant to pass judgment on an issue involving so complex a statute as the LMRDA without the benefit of adequate briefing and argument. Even where issues are purely legal, advocates' arguments often provide insights and perceptions that are simply not ascertainable through library research alone. Deciding an issue without adequate briefing places an inordinate load on the system. We, therefore, remand these issues to the district court, the forum in which Congress vested original jurisdiction in this matter, for its judgment on the substantive[18] merits.

## V. CONCLUSION

Our analysis of this case grows out of two basic tenets of administrative law. First, an appropriate plaintiff may challenge interpretations announced by an agency. Second, an agency may choose to announce interpretations through adjudications rather than through rulemakings. In holding that an appropriate plaintiff may challenge an interpretation announced during an adjudication, the key term is, of course, "appropriate." In most cases, a plaintiff must wait until the interpretation is applied to him before he may challenge it. What makes this case exceptional is that as far as review is concerned, it is now or never. The substance of the statutory interpretations at issue pertain only to non-

---

17. Our holding in no way evades the policy of *Chaney. Chaney* was premised on grounds of judicial competence and the general nonsuitability of enforcement-related decisions for judicial review. There is no policy of extending it to foreclose review of issues which are in fact well suited for review.

18. We reject the plaintiffs' argument that the 1982 memorandum, LMSA 13–82, is procedurally deficient since it constitutes a legislative rule adopted without notice and comment rulemaking as required by 5 U.S.C. § 553. The 1982 memorandum was no more than an internal directive instructing LMSA agents on the agency's enforcement priorities.

enforcement decisions, and no individual nonenforcement decision will ever be reviewable under *Chaney.*

Although we affirm the district court's determination that the plaintiffs may not challenge the agency's decision not to pursue enforcement action against employers and consultants involved in these activities, we also hold that the plaintiffs may challenge the announced statutory interpretations as arbitrary, capricious, or contrary to law. We remand the case to the district court to consider those challenges.

*So ordered.*